**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | No. CV 05-3032-PHX-SMM |
| Plaintiff, | ) ) | **MEMORANDUM OF DECISION AND ORDER** |
| v. | ) ) | |
| CREATIVE NETWORKS, LLC, an Arizona corporation, and RES-CARE, INC., a Kentucky corporation, | ) ) ) ) | |
| Defendants. | ) ) | |

Before the Court is Defendant Res-Care, Inc.'s ("Res-Care") Motion for Summary Judgment (Doc. 93).  Having considered the parties' memoranda and other submissions, the Court now issues this Memorandum of Decision and Order granting Res-Care's motion.[1]

**FACTUAL BACKGROUND**

On September 30, 2005, the Equal Employment Opportunity Commission ("EEOC") filed a complaint against Creative Networks, LLC ("Creative Networks") and its parent company, Res-Care, alleging unlawful employment practices under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and the Civil Rights Act of 1991, 42 U.S.C. § 1981a (Doc. 1).  The EEOC's claim is that Rhonda Encinas-

[1] Res-Care requests oral argument in connection with its Motion for Summary Judgment (Doc. 93). The parties have had the opportunity to submit evidence and briefing. Accordingly, the Court finds the pending motion for summary judgment suitable for decision without oral argument and Res-Care's request is denied.  See LRCiv 7.2(f), 56.2.

1  Castro ("Encinas-Castro") and Kathryn Allen ("Allen"), two former Creative Networks

2  employees, were retaliated against "for having opposed discrimination and/or for having

3  participated in a proceeding pursuant to Title VII, including an investigation of alleged

4  employment discrimination."  (Id.)

5  <u>Res-Care's Acquisition of Creative Networks/Hiring of Ron Cornelison</u>

6      Res-Care purchased Creative Networks in 1998 (Doc. 104, Pl's Statement of Facts

7  ("PSOF") ¶ 4).  Creative Networks is a wholly-owned subsidiary of Res-Care (Id. ¶ 35).

8  Following the acquisition, Freda Smith ("Smith"), Res-Care's Vice President of

9  Operations, determined that Creative Networks needed new leadership (Id. ¶¶ 1, 5).

10  Smith was supervised at the time by Martin Miller ("Miller"), Senior Vice President of

11  the Region for Res-Care (Id. ¶ 3).  In the spring of 2001, Smith and Miller asked Ron

12  Cornelison ("Cornelison") to become Executive Director of Creative Networks (Id. ¶ 7).

13  Smith was involved in hiring Cornelison because it was her job to select and hire the

14  individuals that led Res-Care's subsidiaries (Id. ¶¶ 2, 6).  Cornelison was the director of

15  Creative Networks during April and May of 2003 when the alleged retaliatory acts

16  against Encinas-Castro and Allen occurred (Id. ¶ 16).

17      As the Vice President of Operations, Smith visited Creative Networks four to five

18  times each year (Id. ¶ 9).  Smith and Miller held bi-weekly conference calls with the

19  directors of Res-Care's subsidiaries, including Cornelison (Id. ¶ 10).  Personnel matters

20  were not discussed in these conference calls because the directors of the individual

21  subsidiaries handled those matters themselves (Doc. 104, Ex. 1, Smith Dep. 21:4-22:13).

22  Additionally, Res-Care supplied its subsidiaries with written policy manuals that included

23  information on employee benefits, such as paid time off and health insurance (PSOF ¶¶

24  11-12).  Any changes to the manual to suit a particular subsidiary's needs were approved

25  by Res-Care's regional staff (Id. ¶ 11).

26  <u>Investigation of Employee Complaints</u>

27      Prior to the hiring of Cornelison, Smith held meetings with employees of Creative

28  Networks to address problems at the site during the transition period (Id. ¶ 19).  Anne

1   Phillippi ("Phillippi"), a former Creative Networks employee, wrote a letter to Smith on

2   October 3, 2003 in which she complained that Cornelison had verbally attacked her skills

3   and damaged her reputation (Id. ¶ 20).  Smith felt Phillippi's letter was from someone

4   with sour grapes (Id. ¶ 21).  Res-Care sent staff from Georgia to work with Phillippi and

5   counsel her about her job performance (Id. ¶ 22).  Additionally, Smith personally

6   counseled Phillippi at Creative Networks on one occassion regarding her job performance

7   (Id. ¶ 23).  Furthermore, Res-Care sent Phillippi to Georgia to teach her Res-Care's way

8   of doing business (Id. ¶ 24).

9          While Res-Care had the power to investigate employee complaints against

10  Cornelison, Res-Care did not investigate the complaint of Phillippi because Smith felt

11  Phillippi was a person with "sour grapes."  (Id. ¶¶ 25-26)  As the Vice President of

12  Operations, Smith was tasked with handling employee complaints at Res-Care's

13  subsidiaries, including Creative Networks, as well as being aware of EEOC complaints

14  against Creative Networks (Id. ¶¶ 27-28).  Smith also had some responsibility for

15  investigating discrimination charges filed with the EEOC (Id. ¶ 28).  Despite this

16  responsibility, Smith never met Encinas-Castro or investigated her charges of

17  discrimination (Id. ¶ 30).  After conversations with Cornelison, Smith believed that

18  Encinas-Castro "talked too much" and that there were "issues with her performance."

19  (Id.)

20  Administrative Service Agreement

21         On January 5, 1998, Res-Care and Creative Networks entered into an

22  Administrative Service Agreement ("Agreement") (Id. ¶ 37).  This Agreement has been in

23  effect continuously since its enactment in 1998 and has never been terminated (Id. ¶ 52).

24  Article III of the Agreement sets forth "Duties of Res-Care" and Article IV outlines

25  "Duties of Company."  "Company" refers to Creative Networks under the Agreement (Id.

26  ¶ 38).

27         Article III, Section 1 of the Agreement states, "Res-Care shall process the payroll

28  for all of Company's employees, including the issuance of checks and the withholding of

employment taxes." (Id. ¶ 39)  In accordance with this provision, payroll for all of Res-Care's subsidiaries is processed by one company, ADP, with whom Res-Care has a national contract to perform payroll and paycheck issuing services (Id.).  The subsidiaries compile their payroll information locally and transmit this information to Res-Care (Id.). Res-Care, in turn, transmits it to ADP for processing (Id.).

Article III, Section 1 also states, "Res-Care shall regularly publish positions open with all companies with which it has service contracts in order to furnish Company and other contracting parties access to individuals skilled in the field of developmental disabilities and other relevant disciplines." (Id. ¶ 40)  This provision means that a list of open positions is compiled by Res-Care and then sent to all of its subsidiaries for publication to the employees (Id.).

Article III, Section 2 states, "At Company's request, Res-Care shall furnish assistance in the area of labor relations . . ." (Id. ¶ 41)  Pursuant to this provision of the Agreement, Res-Care helps Creative Networks with collective bargaining agreements, unions, and labor contracts (Id.).

Article III, Section 3 of the Agreement states, Res-Care "shall enter into such contracts, in the name of and at the expense of Company, as may be deemed necessary or advisable for the furnishing of utilities, services, concessions, equipment and supplies for the maintenance and operation of the Facilities . . ." (Id. ¶ 42)  Res-Care's 30(b)(6) deponent Deena Ombres ("Ombres") offered an example of how this provision operates at her deposition.  "Res-Care entered into a national contract with Verizon to provide cell phone service, so employees have the option — those employees who need a cell phone or a Blackberry to do their jobs have the option of entering into an agreement with Verizon to get a better deal . . .The same thing holds true for, say, copier equipment, office supplies, things like that." (Id.)

Article III, Section 4 states, Res-Care "shall advise Company concerning all acts and things to be done in and about the Facilities as shall be required by any statute, ordinance, law, rule, regulation . . ." (Id. ¶ 43)  Res-Care is responsible for offering its

subsidiaries legal advice about compliance with applicable laws and the estimated costs of such compliance (Id.).

Article III, Section 6 states that Res-Care "will provide corporate and regional resource personnel as requested, in the following areas to assist Company on an ongoing basis." (Id. ¶ 44)  The areas include, among others, personnel management, personnel policies, wage and benefit scales, and employee benefit plans (Id.).

Article III, Section 7 states that Res-Care "shall develop or update policies and procedures for Company and recommend changes, where necessary." (Id. ¶ 45)  If a Res-Care subsidiary needs a specific policy to be drafted, it can ask Res-Care to develop or update the policy to comply with the applicable law (Id.).

Article III, Section 8 states that Res-Care "shall purchase supplies and equipment on behalf of Company, as requested, and shall offer participation in Res-Care's national and regional supply agreements, if any, and provide to Company the benefits resulting therefrom." (Id. ¶ 46)

Article III, Section 9 states, Res-Care "shall, as required, maintain for itself and for Company, at Company's expense, certain annual insurance coverage." (Id. ¶ 47) This insurance coverage includes workers' compensation and employer's liability (Id.).

Article III, Section 10 states that Res-Care "shall establish and/or maintain zero balance bank accounts, shall consolidate all receipts and monies arising from the operation of Company's business or otherwise received by Res-Care on behalf of Company's business, and shall provide funds for disbursements from the accounts of said business in such amounts and at such times as the same are required." (Id. ¶ 48)

Article III, Section 11 states that Res-Care "shall institute and/or defend, in its own name or in Company's name, but in any event at Company's expense, any and all legal or administrative actions . . ." (Id. ¶ 49)  This provision requires Res-Care's Legal Department to respond to any EEOC charges filed against Creative Networks (Id.). Indeed, the Legal Department drafted the position statements responding to the EEOC charges of discrimination in the present case (Id.).

1    Article III, Section 12 states, "At Company's request or as deemed necessary by

2    Res-Care, Res-Care shall advance to Company working capital sufficient to sustain and

3    continue Company's operations . . ." (Id. ¶ 50)  If Creative Networks' expenses exceed

4    its revenues, Res-Care is obligated to provide financial assistance to Creative Networks at

5    its request (Id.).

6        Article IX, Section 1 of the Agreement states that Res-Care "shall supervise and

7    direct the keeping of full and accurate books of account and such other records reflecting

8    the results of operations of the Facilities." (Id. ¶ 51)  In accordance with this provision,

9    Res-Care's Legal Department keeps the corporate records of Creative Networks,

10   including budget information, accounts receivable, and accounts payable (Id.).

11   Employee Information Guide

12       Creative Networks' employees were given a copy of the manual "ResCare

13   Building Lives Reaching Potential: Employee Information Guide" ("the Guide") that

14   included Res-Care's policy on workplace discrimination and harassment (Id. ¶ 53).  The

15   Guide was revised four times: November 2002, December 2002, October 2003, and

16   December 2006 (Id.).  It was Res-Care's expectation that Creative Networks used the

17   Guides that were created by Res-Care and distributed to its subsidiaries (Id. ¶ 56).

18       The Guide included a President's Welcome signed by the

19   Chairman/President/CEO of Res-Care (Id. ¶ 54).  Additionally, the Guide invited

20   employees of Creative Networks to voice complaints about their employment directly to

21   Res-Care management (Id. ¶ 57).  Furthermore, the Guide stated that retaliation was

22   prohibited and if it was reported, an investigation would be conducted (Id. ¶ 58).

23   Discrimination complaints against the Executive Director of Creative Networks would be

24   investigated by Res-Care, rather than Creative Networks (Id.).

25       On the latest version of the Guide, dated December 2006, Creative Networks'

26   name appeared nowhere on the cover (Id. ¶ 59).  Rather, the cover contained Res-Care's

27   logo, name, corporate address, and website, along with a statement describing Res-Care's

28   mission (Id.).  At the bottom of each page, only Res-Care's logo appeared (Id.).  In the

1   section titled "Prohibition of Harassment," the Guide stated that Creative Networks

2   employees may contact Res-Care's "Region/Division Human Resources Director at the

3   regional office, and/or the Vice President of Labor and Employee Relations or the Chief

4   People Officer at the Resource Center." (Id.)  This Guide was distributed to all Creative

5   Networks employees (Id.).

6   Code of Conduct

7        Res-Care published a "Code of Conduct" and distributed it to all employees of its

8   subsidiaries, including Creative Networks (Id. ¶ 60).  Res-Care expected that all

9   employees would be familiar with the Code of Conduct (Id.).  Violations were required to

10  be reported to Res-Care through either its website or the "Compliance Action Line." (Id.

11  ¶ 63)  If an alleged violation involved human resource concerns, Res-Care's regional HR

12  official might be tasked with responding to the allegations (Id. ¶ 60).

13       The Code of Conduct displayed only the Res-Care name and logo and did not

14  contain any reference to Creative Networks (Id. ¶ 61).  Contained in the Code of Conduct

15  was a letter to "Fellow ResCare Employee" and signed by Res-Care's

16  Chairman/President/CEO and a Board of Directors member (Id. ¶ 62).

17  Employee Processing Documents

18       Many of the forms that Creative Networks employees were required to sign

19  contained Res-Care's name (Id. ¶ 64).  The employee acknowledgment form signed by

20  Encinas-Castro explained that she should contact Res-Care if she was the subject of

21  discriminatory harassment (Id. ¶ 65).  Res-Care's affirmative action plan applies to all of

22  its subsidiaries, including Creative Networks (Id. ¶ 66).

23       The form titled "Authorization to Request Records Applicant Information"

24  completed by Encinas-Castro as a condition of her employment at Creative Networks lists

25  Res-Care as the entity granted authority to obtain her records (Id. ¶ 67).  Creative

26  Networks is not mentioned anywhere on the form (Id.).

27

28

1  The "Exit Interview Compliance Form" and "Employee Separation-Exit Interview

2  Checklist" form signed by Encinas-Castro upon her termination contains only Res-Care's

3  name and logo (Id. ¶ 68).

### PROCEDURAL BACKGROUND

5  On May 20, 2003, Encinas-Castro filed a charge of discrimination against Creative

6  Networks (Doc. 94, Ex. A, Encinas-Castro's May 2003 Charge).  Creative Networks'

7  parent company, Res-Care, was not mentioned in the charge (Id.).  Next, on June 3, 2003,

8  Allen filed a charge of retaliation against Creative Networks that did not reference Res-

9  Care (Doc. 94, Ex. B, Allen's June 2003 Charge).  Also, on June 3, Encinas-Castro filed a

10 new charge of retaliation against Creative Networks (Doc. 94, Ex. C, Encinas-Castro's

11 Amended Charge).  There was no reference to Res-Care in her charge, either (Id.).

12 Finally, in March 2005, Encinas-Castro and Allen amended their charges to include Res-

13 Care as a party in addition to Creative Networks (Doc. 94, Ex. D, 2005 Amended

14 Charges).

15 On November 18, 2005, Res-Care filed a motion to dismiss for failure to state a

16 claim under Federal Rule of Civil Procedure 12(b)(6) (Doc. 8).  In its Motion to Dismiss,

17 Res-Care claimed that a parent corporation was not liable for the Title VII violations of

18 its wholly-owned subsidiary absent special circumstances (Id.).  The Court denied this

19 motion, finding that "It is *not* beyond doubt that the EEOC can prove no set of facts in

20 support of the claim against Res-Care."  (emphasis in original) (Doc. 19, 6:23-25)  Now

21 that discovery has been completed, Res-Care brings the present summary judgment

22 motion arguing that the EEOC can prove no set of facts supporting a claim against Res-

23 Care.

### STANDARD OF REVIEW

25 A court must grant summary judgment if the pleadings and supporting documents,

26 viewed in the light most favorable to the nonmoving party, "show that there is no genuine

27 issue as to any material fact and that the moving party is entitled to judgment as a matter

28 of law."  Fed. R. Civ. P. 56(c); see Celotex Corp v. Catrett, 477 U.S. 317, 322-23 (1986);

1   Jesinger v. Nev. Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994).  Substantive law

2   determines which facts are material.  See Anderson v. Liberty Lobby, 477 U.S. 242, 248

3   (1986); see also Jesinger, 24 F.3d at 1130.  "Only disputes over facts that might affect the

4   outcome of the suit under the governing law will properly preclude the entry of summary

5   judgment."  Anderson, 477 U.S. at 248.  The dispute must also be genuine, that is, the

6   evidence must be "such that a reasonable jury could return a verdict for the nonmoving

7   party."  Id.; see Jesinger, 24 F.3d at 1130.

8         A principal purpose of summary judgment is "to isolate and dispose of factually

9   unsupported claims."  Celotex, 477 U.S. at 323-24.  Summary judgment is appropriate

10   against a party who "fails to make a showing sufficient to establish the existence of an

11   element essential to that party's case, and on which that party will bear the burden of

12   proof at trial."  Id. at 322; see also Citadel Holding Corp. v. Roven, 26 F.3d 960, 964 (9th

13   Cir. 1994).  The moving party need not disprove matters on which the opponent has the

14   burden of proof at trial.  See Celotex, 477 U.S. at 323-24.  The party opposing summary

15   judgment need not produce evidence "in a form that would be admissible at trial in order

16   to avoid summary judgment."  Id. at 324.  However, the nonmovant "may not rest upon

17   the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific

18   facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); see Matsushita

19   Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-88 (1986); Brinson v.

20   Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995).

21                                    **DISCUSSION**

22         Res-Care seeks summary judgment, asserting that there are no genuine issues of

23   material fact from which a jury could conclude that Res-Care retaliated against Encinas-

24   Castro and Allen in violation of Title VII.  Specifically, Res-Care asserts that it had

25   nothing to do with the personnel decisions of its subsidiary, Creative Networks, and thus,

26   there is no basis for the EEOC to keep Res-Care in the case (Doc. 93, 1:14-18; 6:3-4).

27

28

1    **I.      Special Circumstances Test in <u>Watson</u>**

2           Ninth Circuit jurisprudence holds that "[i]n the absence of special circumstances, a

3    parent corporation is not liable for the Title VII violations of its wholly owned

4    subsidiary." <u>Watson v. Gulf & W. Indus.</u>, 650 F.2d 990, 993 (9th Cir. 1981).[2]  In <u>Watson</u>,

5    the Ninth Circuit Court of Appeals affirmed the trial court's grant of summary judgment

6    to a parent corporation because there was "no indication that the parent-subsidiary

7    relationship [was] a 'sham' or that circumstances exist that would render the parent liable

8    for debts of its subsidiary." <u>Id.</u>  The court noted a different result would occur, however,

9    if there had been evidence that the parent "participated in or influenced the employment

10   policies" of the subsidiary, or that the parent "had undercapitalized [the subsidiary] in a

11   way that defeated potential recovery by a Title VII plaintiff." <u>Id.</u>

12          Cases following <u>Watson</u> have engaged in a factual analysis to determine whether a

13   parent "participated in or influenced" its subsidiary's personnel policies.  In <u>Allen v.</u>

14   <u>Pacific Bell</u>, cited by Res-Care, the district court held that SBC was entitled to summary

15   judgment because it was not a proper party.  212 F. Supp. 2d 1180, 1200 (C.D. Cal.

16   2002), <u>aff'd in part</u>, 348 F.3d 1113 (9th Cir. 2003).  The court determined that SBC's

17   only connection to the case was as the parent corporation of Pacific Bell, and that SBC

18   had exercised no greater control over its subsidiary than was typical in a parent/subsidiary

19   relationship.  <u>Id.</u>  The subsidiary Pacific Bell had separate offices, facilities, human

20   resource professionals, financial staff, accounting, and board of directors from SBC.  <u>Id.</u>

21   at 1189.  Additionally, Pacific Bell and SBC maintained separate payroll records, paid

22   _____

23          [2] <u>Watson</u> cites to two cases in support of this proposition.  In the first, <u>Hassell v.</u>
     <u>Harmon Foods, Inc.</u>, the court looked to whether the relationship between the parent and
24   subsidiary was a "sham." 336 F. Supp. 432, 433 (W.D. Tenn. 1971), <u>aff'd</u>, 454 F.2d 199 (6th
     Cir. 1972).  The second case, <u>Lottice v. Ingersoll-Rand Co.</u>, focused on the parent and
25   subsidiary's separate corporate structures and lack of common employees.   14 Fair
     Employment Practice 708 (N.D. Cal. 1977).  The parent and subsidiary remained distinct
26   corporate entities incorporated in two different states.  <u>Id.</u>  Also, the parent did not control
     the subsidiary's decisions as to hiring, salary, promotion, job classifications, termination, or
27   any other term of employment.  <u>Id.</u>

28

1   their state and federal employment taxes separately, processed their payroll taxes

2   separately, issued separate W-2's, and had separate tax identification numbers.  Id.

3   Finally, Pacific Bell was responsible for making all hiring and work assignment

4   decisions, and SBC exercised no day-to-day control over Pacific Bell's workforce.  Id.  In

5   another case cited by Res-Care, Krahel v. Owens-Brockway Glass Container, Inc., the

6   district court dismissed the parent company, Owens-Illinois, from the suit.  971 F. Supp.

7   440, 456 (D. Or. 1997).  The court emphasized that the subsidiary had enough employees

8   to fall within Title VII and had enough financial assets to pay any potential judgment.  Id.

9       Res-Care argues that there are no special circumstances as articulated in Watson

10  that would prevent summary judgment in its favor (Doc. 93, 7:9-10).[3]  Rather, the

11

12      [3] Res-Care also bases its argument on Morgan v. Safeway Stores, Inc., another Ninth
13  Circuit case.  884 F.2d 1211 (9th Cir. 1989).  In that case, the plaintiff was employed by
    Safeway.  Id. at 1212.  Rather that suing Safeway for discrimination, the plaintiff sued a
14  federal credit union associated with Safeway.  Id.  Since the credit union had fewer than
15  fifteen employees, the Ninth Circuit applied what is known as the integrated enterprise test
    to determine whether Safeway and its credit union could be treated as a single employer for
16  purposes of Title VII.  Id. at 1213-14.  This analysis would allow the plaintiff to bring her
17  Title VII discrimination claim against the credit union despite its small number of employees.
    Despite Res-Care's argument, the Court finds that the integrated enterprise test is
18  not applicable in the present case.  Under the integrated enterprise test, "A plaintiff with
    an otherwise cognizable Title VII claim against an employer with less than 15 employees
19  may assert that the employer is so interconnected with another employer that the two
20  form an integrated enterprise, and that collectively this enterprise meets the 15-employee
    minimum standard.  [The court] uses the integrated enterprise test to judge the magnitude
21  of interconnectivity for determining statutory coverage."  Anderson v. Pac. Maritime Ass'n,
22  336 F.3d 924, 929 (9th Cir. 2003) (discussing the intergrated enterprise test).  Thus, the
    analysis is focused on whether a defendant can meet the statutory criteria in terms of
23  number of employees to qualify as an "employer" under Title VII.
24      In the present case, Res-Care is using the integrated enterprise test to argue instead
    that Res-Care is not jointly liable for the Title VII violations of its subsidiary.  While
25  other circuits have used the integrated enterprise test to establish the liability of a parent
    for a subsidiary's Title VII violations, the Ninth Circuit has never done so.  Norwick v.
26  Gammell, 351 F. Supp. 2d 1025, 1034 n.28 (D. Haw. 2004).  Indeed, the Ninth Circuit
27  has stated that "the [integrated enterprise] test does not determine joint liability . . . but
    instead determines whether a defendant can meet the statutory criteria of an 'employer'
28  for Title VII applicability."  Anderson, 336 F.3d at 928 (emphasis in original).  As such,

- 11 -

relationship between Res-Care and Creative Networks is a typical parent-subsidiary

relationship where the parent supplies cost-saving, centralized services to the subsidiary

(Id. 7:10-11).  The subsidiary is not undercapitalized and is able to defend any charges

against it (Id. 7:11-12).  Moreover, there is no evidence that Res-Care has influenced the

employment policies of Creative Networks (Id. 7:12-14).

As evidence of Res-Care's lack of influence over its subsidiaries' employment

policies, Res-Care relies on Article IV of the Agreement between Res-Care and Creative

Networks (Id. 3:17-4:5, 7:14-16).  This provision allegedly gives responsibility for

employment and personnel issues to the subsidiary, Creative Networks (Doc. 94, Def.'s

Statement of Facts ("DSOF") ¶ 6-7).

**ARTICLE IV**
**DUTIES OF THE COMPANY**

1. Responsibility for Management. [Creative Networks] shall be
responsible for the management, supervision and operation of its
Facilities. Specifically, [Creative Networks] shall select and employ all
personnel at its Facilities, including the Administrator and all other
management personnel. [Creative Networks] shall be responsible for
the formulation and implementation of all rules, regulations, policies
and procedures of the Facilities.

(Id. ¶ 7).  Additionally, Res-Care relies on the affidavit of Creative Networks Human

Resources director James Plutowski ("Plutowski")[4] and 30(b)(6) witness Ombres.

the test has no application if there is an otherwise qualified employer subject to suit in the
case.  Here, there is no indication by any party that Creative Networks does not employ at
least fifteen employees.  Since Creative Networks is a defendant in the present case, the
Court finds that the integrated enterprise test is inapplicable.

[4]The EEOC objects to Plutowski's affidavit on grounds that he was never identified
in Defendants' disclosure statements (Doc. 105).  The EEOC asks that the Court strike
the affidavit.  The Court finds that this objection is unfounded, and therefore, it will not strike
Plutowski's affidavit.  The purpose of pretrial disclosures is to provide the names of those
individuals likely to have discoverable information so that the opposing party may depose
them in advance of trial.  It is unlikely that Plutowski would ever testify at trial, as he appears
to have no information regarding the alleged discrimination of Encinas-Castro and Allen.
His affidavit is solely for summary judgment purposes to show Res-Care's lack of
involvement in employment matters at Creative Networks (Doc. 94, Ex. F, Plutowski Aff.
¶¶ 3-4).  Federal Rule of Civil Procedure 56(e)(1) permits a party to submit affidavits with

1    Plutowski stated that Res-Care had no responsibility for the day-to-day employment

2    matters at Creative Networks, including decisions regarding hiring, discipline, or

3    termination (Id. ¶ 8).  Rather, Creative Networks was the one charged with enforcing its

4    applicable personnel policies and procedures (Id.).  Indeed, in the present case, all of the

5    decisions related to the EEOC charges filed by Encinas-Castro and Allen were made by

6    Creative Networks with no oversight by Res-Care (Id)  In her deposition, Ombres

7    testified regarding the respective responsibilities of the parent corporation Res-Care and

8    its subsidiaries, including Creative Networks.

9    - Creative Networks is a wholly-owned subsidiary of Res-Care, and is
        registered in the State of Arizona as its own legal entity.

10   - The subsidiaries are responsible for training their own employees.
        EEO training is provided by the subsidiaries' HR Manager/Director.

11   - The subsidiaries conduct their own internal investigations of
        discrimination or retaliation complaints made by employees.

12   - Subsidiaries compile their payroll locally and transmit the
        information to the payroll service ADP.  ADP then processes the

13     payroll and issues checks to the subsidiary's employees.

14   - Res-Care enters into national contracts with carriers such as Verizon
        to provide cost efficiencies to its subsidiaries.  Examples include
        phone service, copier equipment, office supplies, and travel services.

15   - Subsidiaries make their own budgets and revenue projections.
     - Res-Care maintains a resource center with employees available to

16     help the subsidiaries on an as-needed basis.  The resource center
        staffs a regional human resources director and regional finance

17     director.
     - Subsidiaries complete their own marketing and development plans.

18   - Res-Care's Legal Department is responsible for drafting position
        statements in response to EEOC complaints.  The subsidiaries,

19     however, pay all legal costs.
     - Subsidiaries maintain their own books of account.

20   - Res-Care creates the Guide which it then distributes to all of its
        subsidiaries.  The subsidiaries then make revisions to adapt the

21     Guide to its specific operations and business.

22

23
     _____

24   a summary judgment motion, provided the affidavit is based upon personal knowledge, sets
     out facts that would be admissible in evidence, and shows the affiant is competent to testify

25   on the stated matters.  Fed. R. Civ. P. 56(e)(1).  Plutoswki's affidavit is based upon his
     personal knowledge as the Humans Resources Director of Creative Networks for fifteen

26   years.  If the EEOC  had wanted to depose him, it could have made a request to the Court.
     Rule 56(f) allows a court to order a continuance for depositions to be taken if the non-moving

27   party shows by affidavit that it cannot present facts essential to its opposition.  Fed. R. Civ.

28   P. 56(f).  As no such request was made, the affidavit will not be stricken.

- Template employee forms are provided to the subsidiaries who then adapt the forms to their needs.
- Subsidiaries' personnel files are maintained at the subsidiary.
- Completed employee forms are kept at the subsidiaries themselves, rather than at Res-Care.

(Id. ¶ 9)

The EEOC attempts to dispute each of these claims and contends that there are disputed issues of material fact regarding Res-Care's involvement in Creative Networks' employment policies.   First, the EEOC asserts that there is evidence Res-Care authored and distributed the written employment policies used by Creative Networks, including its Guide and Code of Conduct (Doc. 103, 4:7-9).  The Guide was distributed to all Creative Networks employees and contained the company's policy on workplace harassment and discrimination (PSOF ¶ 53). It also included a "President's Welcome" signed by the Chairman/President/CEO of Res-Care (Id. ¶ 54).  Furthermore, the Guide displayed Res-Care's logo, name, corporate address, website and mission statement on its cover with no mention of Creative Networks (Id. ¶ 59).  At the bottom of each page, only Res-Care's logo appeared (Id.).  The section of the Guide titled "Prohibition of Harassment" directed employees to contact Res-Care management with any concerns (Id.).

As to the Code of Conduct, the EEOC argues that it was drafted by Res-Care and distributed to all of its subsidiaries, including Creative Networks (Id. ¶ 60).  The Code of Conduct bears only the Res-Care name and logo, without any reference to Creative Networks (Id. ¶ 61).  Employees at Creative Networks were expected to be familiar with the Code of Conduct, and violations were to be reported to Res-Care, either through its website or the "Compliance Action Line."  (Id. ¶¶ 60, 63)  Violations relating to Human Resource matters were sometimes responded to by Res-Care's regional HR official (Id. ¶ 60).  Finally, many of the employee processing documents filled out by Creative Networks employees contained only the Res-Care name and logo (Id. ¶¶ 64-68).

Second, the EEOC argues that Res-Care influenced Creative Networks' policies and practices through its executive employees, such as Cornelison (Doc. 103, 7:6-8). Res-Care retained the power to remove Creative Networks' Executive Director and

replace him with Cornelison (PSOF ¶¶ 5-8).  Smith had the power to call meetings with

Creative Networks employees, and in fact, she did so during the transition period prior to

Cornelison's hiring (<u>Id.</u> ¶ 19).  For example, Smith counseled Phillippi about her poor job

performance (<u>Id.</u> ¶ 23).  Moreover, Smith was responsible for handling employee

complaints against Creative Networks and keeping abreast of any EEOC complaints filed

(<u>Id.</u> ¶¶ 26, 28).  Smith had some responsibility to investigate discrimination charges filed

with the EEOC (<u>Id.</u> ¶ 28).

Third, the EEOC points out that the Agreement between Res-Care and Creative

Networks gave Res-Care some additional responsibilities, including the following:

- Participating in the processing of its subsidiaries' payroll;
- Compiling information about job vacancies from its subsidiaries and then distributing the list of openings to its subsidiaries' employees;
- Assisting its subsidiaries with labor contracts and collective bargaining agreements;
- Supplying its subsidiaries with legal advice regarding employment disputes;
- Providing regional personnel to assist the subsidiaries with personnel management, wage and benefit scales, and employee benefit plans;
- Developing and updating company procedures; and
- Maintaining workers' compensation and employer's liability insurance for its subsidiaries.

(<u>Id.</u> ¶¶ 39-41, 43-45, 47, 49)

Having considered the briefing and evidence submitted by both parties, the Court

finds that the EEOC has not presented sufficient evidence to create a genuine issue of

material fact as to Res-Care's inclusion in the case.  First, Res-Care and Creative

Networks were distinct corporate entities (DSOF ¶ 9).  Creative Networks did its own

human resources, financials, payroll, marketing, development, bookkeeping, and

accounting (Doc. 104, Ex. 2, Ombres Dep. 36:10-37:3).  While Res-Care provided

regional personnel to assist Creative Networks with areas such as personnel policies, this

help was on an "as-requested" basis (PSOF ¶ 44; Doc. 104, Ex. 2, Ombres Dep. 31:24-

32:20).  Furthermore, Creative Networks had its own tax identification number (Doc. 104,

Ex. 2, Ombres Dep. 31:5-19).

1    Second, there is no evidence that Res-Care participated in any way in the decision

2  to terminate Encinas-Castro or to discipline Allen.  Rather, Creative Networks was

3  responsible for making all hiring, work assignment, and termination decisions, and Res-

4  Care exercised no day-to-day control over Creative Networks' workforce (DSOF ¶ 8;

5  Doc. 94, Ex. F, Plutowski Aff. ¶¶ 3-4).  The subsidiaries conducted their own training

6  sessions, including EEO training (Doc. 94, Ex. G, Ombres Dep. 105:14-24).  The

7  subsidiaries also performed their own internal investigations into allegations of

8  harassment and retaliation (Doc. 104, Ex. 2, Ombres Dep. 98:15-24).[5]  Furthermore,

9  employees' personnel files were kept at the subsidiary along with all of the completed

10  employee forms (Id. 70:19-71:23; Doc. 94, Ex. G, Ombres Dep. 123:22-124:7).  This

11  delegation of responsibility for employment matters to Creative Networks was reinforced

12  by Article IV of the Agreement.  Article IV gives Creative Networks responsibility "for

13  the management, supervision and operations of its Facilities," including selecting all

14  personnel and formulating and implementing all rules, regulations, policies and

15  procedures of the Facilities (DSOF ¶ 7).

16    Although Smith visited Creative Networks four or five times each year (PSOF ¶

17  9), had the power to call meetings with Creative Networks' employees, and to counsel

18  them about their job performance (PSOF ¶¶ 19-26), these activities only occurred during

19  the transition period following Res-Care's acquisition of Creative Networks (Doc. 129,

20  Ex. E, Smith Dep. 17:8-18:19, 34:20-35:8; Ex. B, Smith Aff. ¶¶ 4-5).  After Cornelison

21  was hired as the Executive Director of Creative Networks, Smith did hold conference

22  calls with the directors of Res-Care's subsidiaries, but did not discuss personnel issues

23  (PSOF ¶ 10; Doc. 104, Ex. 1, Smith Dep. 20:22-22:13).

24

25    _____

26    [5]Ombres testified that when a charge of discrimination is filed against a subsidiary, the charge is forwarded to Res-Care's Legal Department (Doc. 104, Ex. 2, 46:14-21).  The

27  Legal Department then drafts a position statement using information supplied by the subsidiary (Id.).  However, Res-Care has no involvement in the day-to-day employment

28  decisions that give rise to such charges of discrimination.

1    Third, as to the employment manuals that the EEOC argues were created by Res-

2    Care, these were merely templates that were modified by the subsidiaries to suit their

3    particular circumstances and needs (Doc. 104, Ex. 2, Ombres Dep. 58:19-59:3).[6]  Indeed,

4    the Guide given to Creative Networks' employees exhibits multiple alterations to the

5    version supplied by Res-Care (See e.g., id. 59:21-60:19).  Likewise, the employee forms

6    given by Res-Care to the subsidiaries were templates that could be adapted as needed

7    (Doc. 94, Ex. G, Ombres Dep. 115:13-116:22).  Moreover, while individuals at Res-Care

8    are identified in the Guide and Code of Conduct as contacts for reporting discrimination

9    and Code of Conduct violations, Creative Networks employees also are listed (PSOF ¶¶

10   59-60; Doc. 104, Ex. 5, Employee Information Guide, Creative000442; Ex. 6, Code of

11   Conduct, Creative 000537).

12   Fourth, Res-Care also entered into nationwide contracts with companies such as

13   ADP and Verizon to provide cost efficiencies to its subsidiaries and their employees

14   (PSOF ¶¶ 39, 42; Doc. 104, Ex. 2, Ombres Dep. 17:8-14; 24:16-25:2).  However, this is

15   not indicative of the type of influence and participation in employment policies spoken of

16   in Watson.  The contract with ADP still required the subsidiaries to process their own

17   payroll locally, and checks had Creative Networks' name on them (PSOF ¶ 39; Doc. 104,

18   Ex. 2, Ombres Dep. 17:6-24).

19   Finally, the EEOC has offered no evidence that the parent-subsidiary relationship

20   between Res-Care and Creative Networks is a "sham" or that Creative Networks is

21   undercapitalized in a way that would prevent Encinas-Castro and Allen from recovering

22   any judgment awarded.  Indeed, the primary evidence regarding Creative Networks'

23   finances is the affidavit of Cornelison offered by Res-Care (DSOF ¶ 10; Doc. 94, Ex. H,

24   Cornelison Aff.).  In it, Cornelison states that Creative Networks is able to defend the

25

26   [6]The EEOC claims that any changes made by the subsidiaries needed to be approved
by Res-Care's regional staff, and thus, this fact further illustrates Res-Care's control over
27   Creative Networks (PSOF ¶ 11).  However, the testimony of Ombres indicates that such
28   approval was not in fact required (Doc. 104, Ex. 2, Ombres Dep. 59:4-10).

1   case brought against it, and capable of paying any resulting judgment or settlement (Doc.

2   94, Ex. H, Cornelison Aff. ¶ 3).  Moreover, Res-Care provided Creative Networks

3   working capital as needed to sustain its operations (PSOF ¶ 50).  In the absence of

4   controverting evidence, the Court concludes that Creative Networks is adequately funded.

5   **II.     Ron Cornelison as Agent of Res-Care**

6           As an alternative argument, the EEOC argues that Ron Cornelison was a direct

7   employee of Res-Care, and thus, he acted as its agent in committing the allegedly

8   retaliatory acts against Encinas-Castro and Allen (Doc. 103, 2:8-9, 17-23).  The EEOC

9   claims it is undisputed that Res-Care hired Cornelison to serve as the Executive Director

10  of Creative Networks and maintained the power to supervise, promote, or fire him (Id.

11  2:10-12).  Moreover, it is undisputed that Cornelison had authority over Encinas-Castro

12  and Allen, including the authority to terminate them (Id. 2:13-16).  Drawing on the

13  United States Supreme Court case of Faragher v. City of Boca Raton, 524 U.S. 775, 807

14  (1998), the EEOC argues that Res-Care is vicariously liable for the discriminatory acts of

15  its agent, Cornelison (Id. 2:24-26).

16          In response to this argument, Res-Care claims that Cornelison cannot be made the

17  target of the case (Doc. 129, 6:7).  Cornelison was never mentioned in the initial

18  Complaint and the alleged victims, Encinas-Castro and Allen, based their retaliation

19  claims on meetings held with multiple Creative Networks managers, not only Cornelison

20  (Id. 6:8-11).  Additionally, Res-Care contends that Faragher held that an employer can be

21  vicariously liable for the discriminatory conduct of its supervisors (Id. 6:14-15).  Since

22  the employer, Creative Networks, is a defendant in the present case, it is the one who

23  would be vicariously responsible for any misconduct by its managers, not Res-Care (Id.

24  6:17-19).  Indeed, Res-Care is one step removed from the situation in Faragher and thus,

25  the case is inapplicable (Id. 6:16-17).

26          The Court finds that the situation in Faragher is distinguishable from the present

27  case.  In that case, a former city lifeguard, Beth Ann Faragher, brought a claim against her

28  immediate supervisors, alleging that the supervisors created a sexually hostile work

1   environment in violation of Title VII.  Faragher, 524 U.S. at 780.  Faragher also claimed

2   that her supervisors were agents of the City of Boca Raton, and thus, she also sought a

3   judgment against the City.  Id. at 781.  The United States Supreme Court held that "An

4   employer is subject to vicarious liability to a victimized employee for an actionable

5   hostile environment created by a supervisor with immediate (or successively higher)

6   authority over the employee." Id. at 807.  As a result, the City of Boca Raton was

7   vicariously liable to Faragher for the actions of its supervisors.  Id. at 808.

8        Here, Encinas-Castro and Allen's EEOC charges listed multiple Creative

9   Networks employees responsible for the discrimination, not merely Cornelison (Doc. 94,

10  Exs. A-D).  If Encinas-Castro and Allen are able to show wrongful retaliation by Creative

11  Networks' supervisors, Creative Networks will be the one vicariously responsible for the

12  supervisors' conduct, rather than Res-Care.  Therefore, Faragher's holding does not

13  support keeping Res-Care in the case.

14  **III.   Indirect Employer Theory**

15       Alternatively, in opposing summary judgment, the EEOC argues that Res-Care is

16  liable for Creative Networks' Title VII violations under the indirect employer theory

17  (Doc. 103, 8:24-27).  This theory was articulated in Sibley Memorial Hospital v. Wilson,

18  488 F.2d 1338 (D.C. Cir. 1973) and later embraced by the Ninth Circuit in Gomez v.

19  Alexian Brothers Hospital of San Jose, 698 F.2d 1019 (9th Cir. 1983).

20       In its indirect employer cases, the Ninth Circuit has held that a defendant need not

21  be the plaintiff's direct employer to be liable under Title VII.  Rather, an indirect

22  employment relationship may be enough for Title VII liability.  The statute covers those

23  situations where "a defendant subject to Title VII interferes with an individual's

24  employment opportunities with another employer." Gomez, 698 F.2d at 1021 (quoting

25  Lutcher v. Musicians Union Local 47, 633 F.2d 880, 883 n.3 (9th Cir. 1980)).  See also

26  Ass'n of Mexican-Am. Educators v. State of Cal., 231 F.3d 572, 579-84 (9th Cir. 2000);

27  Anderson, 336 F.3d at 929-932.

28

In <u>Sibley</u>, the defendant hospital operated a nursing office where hospital patients could request the services of a private duty nurse.  488 F.2d at 1339.  Upon a patient's request, the nursing office would contact outside referral services and ask that a private nurse be sent to the hospital to aid the patient.  <u>Id.</u>  The private nurses were considered employees of the patient, and were compensated by them.  <u>Id.</u>  A male private nurse sued the hospital under Title VII, claiming that on two occasions a supervisory nurse turned him away upon his arrival because the requesting patients were female.  <u>Id.</u> at 1339-40.  The hospital moved to dismiss arguing that no employer-employee relationship existed as required to come under Title VII's coverage.  <u>Id.</u> at 1340.  The District of Columbia Circuit held on appeal that Title VII did not require a direct employer-employee relationship.  <u>Id.</u> at 1340-41.

Then in <u>Gomez</u>, the Ninth Circuit adopted <u>Sibley</u>'s reasoning to find a hospital was an indirect employer.  A Hispanic physician working for the corporation AES submitted a proposal to the defendant hospital to operate the hospital's emergency room.  <u>Gomez</u>, 698 F.2d at 1020.  The hospital allegedly rejected the proposal due to the high number of Hispanics working for AES.  <u>Id.</u>  After the physician sued under Title VII, the district court granted the hospital summary judgment on grounds of standing.  <u>Id.</u>  The district court held that under the contract, the plaintiff would have been an employee of AES, rather than the hospital, and AES would have been merely an independent contractor.  <u>Id.</u>  The Ninth Circuit reversed, and held that AES's status as an independent contractor did not mean that the hospital had not somehow interfered with the employment relationship between the physician and AES.  <u>Id.</u> at 1021-22.  The Ninth Circuit noted the perverse result if the hospital were allowed "'to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so'" with its own employees.  <u>Id.</u> at 1021 (quoting <u>Sibley</u>, 488 F.3d at 1341).

Despite the EEOC's arguments, the Court finds the indirect employer theory inapplicable in the present case.[7]  Each of the Ninth Circuit cases drawing on <u>Sibley</u>'s rationale has done so in cases where the indirect employer was the entity engaging in the discriminatory conduct.  In <u>Sibley</u>, the indirect employer was the hospital that refused to allow the male nurse to treat the female patient, while in <u>Gomez</u>, it was the hospital that refused to employ AES because of its Hispanic doctors.  <u>See</u> <u>Sibley</u>,488 F.2d at 1338; <u>Gomez</u>, 698 F.2d at 1019.  In the present case, however, the alleged retaliation did not occur at a facility controlled by Res-Care, but instead at its subsidiary, Creative Networks, that actually employs and supervises Encinas-Castro and Allen and their alleged harassers.  Under these circumstances, the considerations justifying liability for indirect employers under Title VII are not applicable.  Moreover, <u>Sibley</u> and its progeny extended Title VII coverage to indirect employers when they "'interfere[d] with an individual's employment opportunities with another employer.'"  <u>Gomez</u>, 698 F.2d at 1021 (quoting <u>Lutcher</u>, 633 F.2d at 883 n.3).  Res-Care is not interfering with Encinas-Castro and Allen's relationship with their employer, Creative Networks, because it was Creative Networks that allowed the retaliation to occur at its workplace.

## CONCLUSION

In conclusion, the EEOC has not raised a genuine issue of material fact for its claims against Res-Care, and therefore, the Court grants summary judgment in Res-Care's favor.

Accordingly,

**IT IS HEREBY ORDERED GRANTING** Defendant Res-Care, Inc.'s Motion for Summary Judgment (Doc. 93).

---

[7]The EEOC gives a list of factors supposedly relevant to the indirect employer analysis and cites to <u>Anderson</u> (Doc. 103, 9:7-16).  While the Ninth Circuit in <u>Anderson</u> took such considerations into account in its analysis, it is not clear that an analysis of these factors is always required under either <u>Sibley</u> or its progeny.  Since the Court finds the indirect employer theory inapplicable in the instant case, it does not consider these factors.

1    **IT IS FURTHER ORDERED** that Defendant Res-Care is dismissed from the

2    present case.

3    DATED this 19th day of March, 2009.

4

5

6    Stephen M. McNamee
     United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28