```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF ARIZONA
 2

 3   EQUAL EMPLOYMENT OPPORTUNITY        )
     COMMISSION,                         )
 4                                       )
                         Plaintiff,      )
 5                                       )   No. 2:05-cv-03032-SMM
           vs.                           )
 6                                       )   Phoenix, Arizona
     CREATIVE NETWORKS, LLC et al,       )   April 12, 2010
 7                                       )   1:32 p.m.
                         Defendants.     )
 8   _____

 9

10            TRANSCRIPT OF FINAL PRETRIAL CONFERENCE
             BEFORE THE HONORABLE STEPHEN M. MCNAMEE
11                  UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Plaintiff:          By: Sally Clifford Shanley
                                 By: Meenoo Chahbazi
14                               By: Christopher Houk
                                 EQUAL EMPLOYMENT OPPORTUNITY
15                               COMMISSION
                                 3300 N Central Avenue Suite 690
16                               Phoenix, AZ  85012

17   For the Defendant:          By: James Lawrence Blair
                                 By: Sandra A. Shoupe-Gorga
18                               RENAUD COOK DRURY MESAROS PA
                                 1 N Central Avenue Suite 900
19                               Phoenix, AZ 85004-4418

20   Court Reporter:             Vicki Reger

21   Transcription Service:      AVTranz
                                 365 E. Coronado Rd., Ste. #100
22                               Phoenix, AZ 85004-1525

23

24   Proceedings recorded by electronic sound recording, transcript
     produced by transcription services.
25
```

<u>April 12, 2010</u>

1

2    THE CLERK:  Come to order.  Court is now in session.

3    The Honorable Stephen McNamee presiding.

4    THE COURT:  Thank you.  Please be seated.

5    THE CLERK:  Civil Case 2005-3032, EEOC versus

6    Creative Networks, on for final pretrial conference.

7    THE COURT:  Okay.  May I have your appearances,

8    please?

9    MS. SHANLEY:  Good afternoon, Your Honor.  I'm Sally

10   Shanley for the EEOC and I have with me Ms. Meenoo Chahbazi and

11   Christopher Houk, both attorneys for the EEOC as well.

12   THE COURT:  Okay.  It's Ms. Chahbazi?

13   MS. CHAHBAZI:  Yes, Your Honor.

14   THE COURT:  Thank you.  And Mr. Houk?

15   MR. HOUK:  Yes, sir.

16   THE COURT:  Okay.  Thank you.

17   MR. BLAIR:  Good afternoon, Your Honor.  Jim Blair

18   and Sandra Shoupe-Gorga on behalf of Creative Networks.

19   THE COURT:  Thank you.

20   Okay.  Let's see where we are here.  First of all, I

21   guess, the first order of business is that Ms. Rosas claims

22   that she's had enough of this, if she wants to move on or do

23   something else; is that right?

24   MS. SHANLEY:  That's right, Your Honor.  In fact,

25   she's move on as of this  morning.

1           THE COURT:  As of this morning?

2           MS. SHANLEY:  Yes.

3           THE COURT:  Gee whiz.  I thought we can at least get

4    one more hearing out of this.

5           MS. SHANLEY:  So did we, Your Honor.

6           THE COURT:  Surprise.  Okay.  You are letting her

7    withdraw and moving along.

8           Okay.  Next thing is, we're going to distribute draft

9    preliminary instructions.  Now, these are not the final

10   instructions.  We'll get to those as we get closer to trial,

11   but these are the preliminary instructions that deal with the

12   matters that begin at the beginning of the case.  And Mr. Blair

13   and Ms. Shoupe-Gorga, you will also note that there's an

14   instruction there that deals with both Defendant -- or both

15   Plaintiffs in this case.  And you will gather by that, and I'll

16   listen to your arguments on the motion to sever, but I put that

17   in there out of an abundance of caution that if you don't carry

18   today on your motion to sever, that they're both going to be in

19   the same lawsuit.  And I'll let you argue that, but we deal

20   with this a lot in, you know, in criminal cases.  We'll deal

21   with a lot, not as much in civil cases, and the instructions to

22   the jurors are very clear about what their duties are and how

23   they weigh the evidence and things like that, and they're very

24   diligent in their efforts, at least that's been my experience.

25           So -- and the rule seems to be inclusion rather than

4

1    severance.  And the way I look at it is, the allegations as

2    relate to Ms. Allen have their impetus in Ms. Encinas-Castro's

3    case, because the -- a lot of the witnesses are the same.  And

4    it's she, including Ms. Allen, is a witness in that case, gets

5    the ball rolling as to Ms. Allen and I don't think we have to

6    have all these people come back and say the same thing twice.

7    But that's my preliminary rulings and I'll be happy to listen

8    to anything you have to say, if you can persuade me to the

9    contrary, and that's all right.

10              So if you want to do that.  I think there's a couple

11   of other things we'll -- we have inclusion today.  There's also

12   an old outstanding discovery dispute with regard to the

13   interview and communication with Ms. Edna Faulkner.  I don't

14   know if that's still alive or not, but --

15              MR. BLAIR:  It is still alive, Your Honor.

16              THE COURT:  Okay.  All right, then with that, the --

17   I guess we ought to do the order relating to the bifurcation,

18   if you wish.

19              MR. BLAIR:  In light of your preliminary ruling, Your

20   Honor, I'll be brief with this, but I would like to state on

21   the record --

22              THE COURT:  Sure.

23              MR. BLAIR:  -- a summary of why we believe the

24   matters should be bifurcated.  There really are four factors

25   the Court looks at, and we believe any one of which is enough

1    to enable a bifurcation.  In this case we believe three of them

2    absolutely support bifurcation.

3         The first of those is distinct claims.  We believe if

4    you look at the claims themselves, you see that each of the

5    women believe they have, or when they went to the EEOC stated

6    they had separate claims.  In their reply brief -- or in our

7    reply brief at Page 2 we point out that they really are

8    separate witnesses.  I know the Court just said a minute ago

9    that this -- the rumor mill involving Ms. Encinas-Castro are

10   some of the same witnesses, but we believe a careful reading of

11   what the record says about those individuals is that most of

12   them have something to say about Ms. Allen, but most -- but all

13   of them really are there to talk about escalating the rumor

14   mill to Mr. Cornelison as to Ms. Encinas-Castro and not as to

15   Allen.

16        There's been no testimony that's been developed in

17   this heavily discovered case that suggests the top of the

18   pyramid, at Mr. Cornelison's level, that there was anything

19   suggesting Ms. Allen got there.  Ms. Encinas-Castro certainly

20   got there under some of the allegations coming from the

21   Plaintiffs' side of the case, but there's no testimony that

22   gets Allen to the top of the pyramid to Cornelison to stimulate

23   that counseling session.

24        So we believe it's not only the --

25        THE COURT:  If that's the case, might you not be

6

```
1    entitled to a Rule 50 Motion?
2              MR. BLAIR:  Yes.
3              THE COURT:  Okay.  Go ahead.
4              MR. BLAIR:  Yes.  As to -- besides the distinct
5    claims, we believe the jury confusion is a difficult thing, and
6    that goes right to this idea of the rumor mill.  I know that
7    the EEOC suggests that this is a rather simple case, but it
8    isn't a simple case when you bring these people in and they all
9    talk about who said what to whom and ultimately whether there
10   are two counseling sessions or one.  And this piggybacking of
11   one claimant on the other one's rumor mill, we believe is a
12   separate basis for bifurcation.
13             As to the prejudice issue, which is the third factor,
14   which we believe supports bifurcation in this case.  It's not a
15   hostile work environment case.  It's not a classic class case
16   that the EEOC often brings to the District Court.  These are
17   two retaliation cases and they're separate retaliation cases in
18   our minds.  And we believe that if you look at the retaliation
19   instruction that the EEOC has proposed in this final pretrial
20   order, you see that they really are separate retaliation
21   claims.
22             THE COURT:  Well, don't you think if I gave them
23   separate instructions, one related to Ms. Encinas-Castro and
24   one as to Ms. Allen, as to say these are retaliation claims,
25   which I would give a preliminary matter, but they must treat
```

1  them differently, and then give the elements as to each one,

2  and they have to look at each one differently, at both the

3  outset and probably in the middle and the end of the case,

4  don't you think that would help the jury to focus on the

5  distinction between the two?

6          MR. BLAIR:  Yes.  We've certainly thought about that.

7  It certainly is a way to try the cases as one, but I believe

8  when you combine the confusion element with this prejudice

9  element, that you really are -- a lot of qualification has to

10  take place.  And the question is whether the jury is able to

11  understand all of the qualifications that distinguish the

12  Encinas-Castro case from the Allen case.

13          THE COURT:  Okay.

14          MR. BLAIR:  The fourth factor is judicial economy.

15  And the only point I'd make there, certainly it's less

16  efficient to try a case -- similar cases twice than it is to

17  try it once, but my point is that -- and we pointed this out in

18  the reply brief -- that the allotted time that the Court has

19  provided is more than sufficient time to get both cases tried

20  and EEOC didn't even counter that argument.  So apparently they

21  recognize too that the cases can both be tried in a total of

22  eight days if that were the ruling from the Court.

23          I'll just say briefly, the points EEOC has made, I

24  believe many of them, in fact, help the bifurcation issue go

25  our way.  The first one is, if you took a look at what their

1  case really is, I argue it's a class case and a hostile

2  environment work case that they want to direct at the director

3  of Creative Networks, Ron Cornelison.  That's not what this

4  case really is or should be.  It should be two retaliation

5  cases.  And I believe they want to throw --

6          THE COURT:  Well, that's what was pled.

7          MR. BLAIR:  Pardon me?

8          THE COURT:  That's what was pled, retaliation.

9          MR. BLAIR:  It is, but I think what they would like

10  to do through presentation of witnesses and trying the cases

11  together -- or let me try this a different way.  It also could

12  be tried separately.  They could have pled two cases and it

13  would have gone forward just like this too because they are

14  separate cases.

15          THE COURT:  Well --

16          MR. BLAIR:  I will concede that some of the

17  witnesses, Cornelison for sure, would be in both trials, but

18  most of these other witnesses, I believe, are separate

19  witnesses.

20          THE COURT:  Okay.  Well, you were not here, I think,

21  at one of the last hearings and Mr. Houk and I had this same

22  conversation about his view of the case and what I believe what

23  was pled and discovered dealing with retaliation versus a

24  wide-ranging, broad discrimination claim.  I intend to try it

25  on what was pled and what the documents say.

1        MR. BLAIR:  I did hear about that hearing, Your

2  Honor, and I apologize for not being at that hearing, but I did

3  understand that that exchange took place.

4        THE COURT:  Okay.  So I mean, that goes -- kind of

5  cuts back to the other side of the fence a little bit.

6        MR. BLAIR:  Only other points I would make is that,

7  while they call it an intertwined case, I've already argued, I

8  don't really believe it is, except as to Cornelison.  The cases

9  cited -- I just pointed out in our reply brief that there are a

10 lot of cases we found where bifurcation was permitted; a lot of

11 cases EEOC has found where bifurcation was denied.  I'm not

12 sure we found a case where there were two retaliation

13 claimants, on the other hand I also saw from Wright and Miller

14 and a whole bunch of cases that it really is a trial court

15 discretion matter anyway.

16        They've not suggested why it prejudices them.

17 They've not suggested that they're going to get inconsistent

18 results if it's bifurcated.  And the last point is that they

19 say they would have done discovery differently.  I'm not sure

20 how they would have, but they certainly didn't declare --

21 suggest how they would have done it any differently.  And

22 that's all I have, Your Honor.

23        THE COURT:  Thank you, sir.  Counsel?

24        MS. CHAHBAZI:  Your Honor, I'm going to present --

25 this is Meenoo Chahbazi, I'm going to present the argument for

1    EEOC on the opposition to the motion to bifurcate.  Your Honor,

2    we -- our position is that when you look at the elements of

3    retaliation, which are protected activity and adverse action

4    and the causal link between those two, in each of those

5    elements there are intertwined facts that intertwine the

6    allegations related to Encinas-Castro and Allen.  As you've

7    referenced before, Your Honor, the impetus for Allen's case is

8    Encinas-Castro's charge of discrimination, as well as her

9    complaints of discrimination.  Encinas-Castro protected

10   activity is her charge on her complaints and Allen's protective

11   activity are her role in being named as a witness to the charge

12   of discrimination, as well her role as a witness to the

13   complaints of incidents of Encinas-Castro's claim of

14   discrimination.

15          Therefore, Allen's protected activity is intertwined

16   with Encinas-Castro's charge of discrimination and

17   Encinas-Castro's complaints of discrimination.  You cannot have

18   a trial for Allen that does not address Encinas-Castro's

19   complaints of discrimination and her charge.

20          THE COURT:  Well, I -- even if we did sever it, you

21   could get by that, but with a statement of the case to the

22   jury.  This is case growing out of a claim where she was named

23   as a potential witness in a discrimination case by a co-worker

24   and she was fired because when they found out she was a

25   witness, they tried to stifle her by firing her for an improper

1  motive, and therefore they retaliated against her.  Couldn't

2  you do that?

3          MS. CHAHBAZI:  Your Honor, I believe that there's a

4  wide-range of relevant, highly probative evidence relating to

5  Encinas-Castro.  And I believe our position is that the jury

6  should be able to listen to that highly probative evidence in

7  further detail.

8          And, Your Honor, with respect to the adverse action,

9  we believe that's intertwined as well.  There were two

10 back-to-back meetings where Encinas-Castro was terminated and

11 Allen was threatened with termination.  Regarding the

12 back-to-back meetings, the first was at 2:00 p.m. May 30th,

13 2003.  The second one was between 15 minutes and an hour later.

14 After they terminated Encinas-Castro they said, we should bring

15 in Allen for a meeting and meet with her as well.  Our position

16 is that whatever adverse taken -- action was taken against

17 Encinas-Castro is intertwined with what was taken against

18 Allen.  That the intent was intertwined and that the conduct

19 was intertwined.

20         Additionally, Your Honor, our position is that Mr.

21 Cornelison specifically asked Allen during the meeting with

22 Allen what she knew about Encinas-Castro's EOC charge.

23 Therefore, Allen is a very important witness to Encinas-Castro

24 and vice versa as well.  And with regard to the causal link,

25 the intent to take adverse action is intertwined we believe, as

1   evidence by those two back-to-back meetings.  As I mentioned

2   before, the notice involved is intertwined.

3        And further, we do believe there will be confusion

4   among the jury if the two claims are bifurcated.  You know,

5   this is very highly probative evidence, as I said before, and

6   the facts relating to the protected activity are highly

7   probative, the facts relating to adverse action are highly

8   probative and necessary to both cases.

9        And we do believe that two juries can make

10  inconsistent findings, Your Honor.  One specific example is if

11  a jury finds in favor of Allen, implicit in that finding would

12  be that they found that the Creative Networks management had

13  notice of Encinas-Castro's complaints of discrimination,

14  because they would have had to have notice that Allen was a

15  witness to those complaints of discrimination or a witness to

16  the EOC charge.

17       So implicit in any finding in favor of Allen, would

18  be finding that Creative Networks had notice relating to

19  Encinas-Castro charge, and that there was also a retaliatory

20  intent involved in anything that resulted in terms of Encinas-

21  Castro.  So if any jury finds in favor of Allen, right then and

22  there, you know, you can have inconsistencies if the jury does

23  -- if another jury does not find in favor of Encinas-Castro.

24  And that's the real example of when there would be inconsistent

25  findings.

1          It's also not in the interest of judicial economy.

2   The Defendant alleges that we did not address this, but that's

3   incorrect.  If you look at our brief, we did say that it's not

4   in the interest of judicial economy and will waste the time of

5   the jurors.  At a minimum, Encinas-Castro, Allen and Cornelison

6   will have to testify twice.  Bonni Cooper and Ginger Call may

7   also testify twice.  Megan Neal may testify twice.  Melanie

8   Butler may testify twice.

9          We haven't finalized our schedules yet, in terms of

10  witness testimony, but there will be redundancies and

11  duplicativeness in terms of calling witnesses twice.  You know,

12  it's impossible to predict how many days it will be.  We -- you

13  know, our position is that it will definitely take longer and

14  you'll have -- if you're going to impanel another jury, that's

15  going to take a lot of extra time.  We believe that if you

16  don't bifurcate, our position is that it would be, you know,

17  around five days or less if the trial was bifurcated.  It will

18  definitely take less time.

19          Additionally, Your Honor, the EOC does have a public

20  purpose.  We serve in the public interest.  This is very

21  unusual in terms of --  I mean, we're not aware of any other

22  EOC cases in which the allegations, in terms of retaliation by

23  the same management at Creative Networks, are intertwined, and

24  yet, you know, the parties would be bifurcating and looking at

25  the victims' cases individually.  We believe that there's much

1    too -- our position is that there's much too much probative

2    evidence for that to happen.

3              THE COURT:  You may not be aware of any other case,

4    but there's always a first time for everything.

5              MS. CHAHBAZI:  Your Honor, that's true.  There is a

6    first time for everything.  We -- our position is that that

7    would not be in the interest of justice, would not be in the

8    interest of judicial economy and would not be in the interest

9    of the Court.

10             THE COURT:  I understand.  I appreciate it.  Anything

11   else?

12             MS. CHAHBAZI:  Your Honor, I just wanted to point

13   your attention also to Defendants' citation of some cases that

14   did not advocate their position.  For example, the <u>Vichare v.</u>

15   <u>AMBAC Inc.</u> case.  In that court -- in that case actually the

16   Defendant asserts that the Court granted bifurcation; actually,

17   they denied it.  And also another case, <u>Hangarter</u>, they support

18   -- and use to support their position, but the Ninth Circuit

19   denied bifurcation based on the overlapping factual issues.

20             THE COURT:  Okay.

21             MS. CHAHBAZI:  And --

22             THE COURT:  Thank you very much.

23             MS. CHAHBAZI:  Thank you, Your Honor.

24             THE COURT:  Thank you.  Anything you wish to respond

25   to or not?

1          MR. BLAIR:  Can I say like three comments briefly,

2     Your Honor?

3          THE COURT:  Sure.

4          MR. BLAIR:  The first one I'd make is to -- as to the

5     separate charges.  Counsel and the Court were discussing

6     whether separate charges could have been brought.  Well, in

7     fact -- or whether Encinas-Castro could have been almost any

8     other employee.  Well, if you read Exhibit 1 to our motion,

9     that's in fact exactly the way Ms. Allen described her charge.

10    She says, a former employee of Creative Networks filed a charge

11    of discrimination.  So that's kind of like a human way of

12    demonstrating that the case -- Allen acknowledged the case

13    could have been tried separately and there's no reason why it

14    couldn't have been tried separately.  Allen anticipated that it

15    was just some former employee; it wasn't Encinas-Castro.

16          The second point I'd make is that Counsel was talking

17    about whether it's confusing for separate juries.  Well, it's

18    not confusing at all for separate juries.  If the cases are

19    tried separately there won't be any confusion at all with the

20    second jury hearing the case, they won't have heard the first

21    case.

22          And the third point I would make is as to witnesses.

23    At Page 3 and 4 of our reply brief, we point that out Bonni

24    Cooper, one of the witnesses that EEOC says has to testify

25    twice, she knew about the Encinas rumors but she didn't know

1    about Allen.  Also, Melanie Butler is another witness the EEOC

2    says has to testify twice if the cases were bifurcated.  She's

3    no -- we have transcript references there at Page 4 of our

4    reply brief.  Butler knows Allen, but not Encinas-Castro.  And

5    thirdly, Megan Neal, another individual who EEOC contends have

6    to testify -- would have to testify twice, at the same page we

7    point out from the transcript that she hardly knew Encinas-

8    Castro, on the other hand she knows Allen pretty well.  That's

9    all I have, Your Honor.

10            THE COURT:  Thank you.  This matter will be deemed

11    submitted and we'll give you something in writing that you can

12    share with your clients.

13            The second thing is the -- you have some motions in

14    limine and one of them has -- and then we'll get to the issue

15    about the discovery dispute.  But the first thing is the --

16    there's a motion in limine to exclude the testimony regarding

17    rumored personal relationships between various Creative

18    Networks' employees.  And the Defense had made a motion to

19    exclude that, correct?

20            MR. BLAIR:  That's correct, Your Honor.

21            THE COURT:  Do you intend to try and get into some of

22    that stuff?  It's hearsay and rumor, it's unfounded.  Are you

23    just going to have everybody testify as to rank hearsay?

24            MR. HOUK:  Your Honor, you're referencing motion in

25    limine number one, I'm assuming?

17

```
1              THE COURT:  Yes.
2              MR. HOUK:  Your Honor, we have not made that
3    determination at this point, but we --
4              THE COURT:  Now, wait a minute.
5              MR. HOUK:  -- we believe it would be --
6              THE COURT:  We're getting ready to go to trial.  You
7    need to tell me what you intend, because they made a motion in
8    limine and you can't tell me we haven't decided if we're going
9    to get into that or not and a lot of it has to do with, do they
10   have personal knowledge?
11             MR. HOUK:  Your Honor, there may be personal
12   knowledge of this, but it is premature, we believe, to have a
13   ruling on this.  We believe that, based on documents and there
14   is some testimony that can be developed that may lead to an
15   establishment of a personal relationship.
16             THE COURT:  In front of the jury you want to just go
17   on a fishing expedition?  You don't know this because of
18   discovery yet?
19             MR. HOUK:  Your Honor --
20             THE COURT:  That's highly prejudicial.
21             MR. HOUK:  -- we will not raise this unless we are
22   certain that such a relationship has occurred, but at this
23   point it would be premature.  We would like to take the time
24   between now and the time of trial to flesh out and make sure
25   that we're careful in presenting this, but we will not present
```

1  it if it is just rumor.  But if it's based on personal

2  knowledge, Your Honor, the jury has a right to hear about,

3  under Rule 607, the particular biases of a witness who may

4  testify according to Defendants about the poor -- alleged poor

5  attitude of Ms. Allen.  The jury has a right to know whether

6  that individual might be biased in her testimony, which would

7  support Mr. Cornelison.

8         THE COURT:  Well, let me hear from the other side

9  because this is their motion to exclude and I want to hear -- I

10  mean, you kind of got up there, I think, a little out of turn,

11  but I'm very concerned about this one.

12         MS. SHOUPE-GORGA:  Good afternoon, Your Honor.  Like

13  Your Honor we're very concerned about this one.  And contrary

14  to what the EEOC has said, they have had more than a good

15  opportunity to develop this testimony and what they've had is

16  just individuals who have testified well, there could have been

17  a rumor; there might have been a rumor.  There's nothing that

18  substantiates it.

19         The other thing too is they -- the EEOC also point

20  blank asked Mr. Cornelison in deposition and he was just

21  totally insulted and he said absolutely not, that's

22  preposterous.  And to continue this into trial is just

23  specifically what a motion in limine is for, it's to get rid of

24  things that are highly prejudicial where the damage will be

25  done if it's raised.

1          And in addition, if I might explain to the Court and

2    distinguish a moment for the Court, the three cases that were

3    raised by the EEOC.  In each of those cases and their response,

4    Your Honor, it showed that there had to be a personal stake in

5    the outcome in order for a romantic or sexual situation to come

6    into play, and there is nothing like that in this case.  There

7    is no evidence, no testimony, nothing like that in this case.

8    So we request that our motion in limine on this subject be

9    granted.  Thank you.

10          THE COURT:  Thank you.

11          MR. HOUK:  As we stated, Your Honor, we would only

12    present this evidence if we have a good faith basis to believe

13    at the time of trial that Mr. Cornelison had an alleged

14    personal relationship with a witness who they said will --

15    they're going to call and who will testify negatively about one

16    of our charging parties.  If that --

17          THE COURT:  Well, you knew she -- they were going to

18    charge -- I mean, they -- you knew that they were going to call

19    this person as a witness and you had time to get discovery to

20    find this out because you'd heard those rumors elsewhere, but

21    you haven't fleshed it out yet.  And in order for them -- if

22    they call the witness, in order for you to get that testimony

23    out of the witness, you have to go on a certain fishing

24    expedition in front of the jury.

25          MR. HOUK:  No, Your Honor, it does not have to occur

1  before the jury if these witnesses are witnesses that we can

2  speak to without their being attorney/client privilege issue.

3  We can develop this up to the time of trial, because these

4  witnesses are witnesses that we can speak with outside the

5  presence of Defense Counsel.

6          THE COURT:  You're playing a very dangerous game,

7  Counsel, and if this blows up on someone, somebody is going to

8  pay for all this fun we're having.  This is very dangerous.  If

9  there was something there to be gotten, it should have been

10  gotten before now.  Unless you can -- so I'm going to grant the

11  motion and you'll have to make a motion before me to set it

12  aside and present some sort of evidence that you know

13  personally for me to set this aside, because right now you

14  should have had the opportunity to discover this, it's highly

15  inflammatory, there appears to be a direct evidence to the

16  contrary, not -- I will tell you, it wouldn't be the first time

17  someone said I've never had an affair with someone and later on

18  they've confessed to it.  I mean, it wouldn't be the first time

19  and if that's the case and it affects the outcome or affects

20  that person, I'll deal with that, but as of right now all you

21  have is speculation and innuendo at this point.  And I'm going

22  to grant their motion and you -- so before you can bring it up

23  in front of the jury, you have to motion the Court to have it

24  set aside.

25          MR. HOUK:  Thank you, Your Honor.

1          THE COURT:  Next is -- the Defense brought a motion

2    for keep witnesses from speculating.  In other words, to talk

3    about personal knowledge.

4          MS. SHOUPE-GORGA:  Yes, Your Honor.  Our motion was

5    brought with regard to Bonni Cooper, Melanie Butler and Ann

6    Phillippi.  And Bonnie Cooper and Butler, through their own

7    testimony, admitted to the limitations of their information and

8    knowledge on this -- the subject at issue for trial.  We are

9    not restricting testimony that may have a bearing on the actual

10   outcome of the trial, but what we're saying is, is that they

11   should not be using this forum to go off on collateral issues

12   of their own discontent that have nothing to do with either Ms.

13   Encinas-Castro or Ms. Allen.

14          And with regard to Ms. Phillippi, contrary to what

15   the EEOC said, we do know what she's going to testify about.

16   We provided Your Honor a copy of a letter that she wrote to

17   Freda Smith.  And in that, she complained about Mr. Cornelison

18   in situations that have no bearing on the facts of this case.

19   And we know that that's where they're going because they have

20   also put on their exhibit list this same exhibit, which is this

21   letter to Ms. Freda Smith.

22          This is highly prejudicial.  It's not relevant.  It's

23   going off on a fishing expedition again.  But with regard to

24   Melanie Butler or Cooper, to the extent that they had specific

25   knowledge, which is in each of their cases fairly limited, we

1    would not object to that.  It's just the ancillary issues.

2    Thank you.

3              THE COURT:  Thank you.

4              MR. HOUK:  Your Honor, motion in limine number two is

5    also premature.  It's true that they did not depose one of the

6    witnesses, so they don't know what's going to be said, that's

7    Ms. Phillippi.  With regard to the other two, these are key

8    witnesses.  These are essential witnesses to our case.  Ms.

9    Cooper, number one, her testimony was cited by this Court's

10   summary judgment order as going to knowledge that Creative

11   Networks had of Ms. Allen being a witness to Ms. Encinas-Castro

12   charge of discrimination.  Ms. Butler, as well, is critical to

13   knowledge.

14             The motion in limine is not limited to specific types

15   of evidence.  Their motion in limine on the first page in the

16   first -- in the second sentence says, "These witnesses are

17   without personal knowledge and therefore are not competent to

18   testify and must be excluded."

19             So they're seeking in the motion to have all their

20   testimony excluded.  As we noted in our response, these are

21   critical witnesses.  Mr. Cooper -- Ms. Cooper specifically

22   spoke with Ms. Rhonda about the charge of discrimination.  All

23   three of the witnesses worked at the same time as the charging

24   parties and they knew about Ron Cornelison's style.

25             THE COURT:  Wait, say that again, please.  They knew

1    about what?

2           MR. HOUK:  Ron Cornelison's management style.

3           THE COURT:  Well, he may be the most disliked person

4    in the world about his management style, but as long as he

5    didn't discriminate that management style doesn't hold water,

6    right?

7           MR. HOUK:  I understand --

8           THE COURT:  No, not do you understand.  Do you agree

9    with that?

10          MR. HOUK:  No, Your Honor.

11          THE COURT:  Well, then why?  Why, do you think he

12   should be a benevolent person?  I mean, that's what all the

13   management books say you should try and do a lot of things, if

14   you read Harvey McKay's books, but on the other hand not

15   everybody follows those.  So the question is, even if he's not

16   a decent, nice manager, he's sort of rude abrupt, as long as he

17   doesn't discriminate --

18          MR. HOUK:  If he doesn't like people opposing

19   discrimination, Your Honor, and he retaliates as a result of

20   that, then Your Honor, we will argue that that is unlawful and

21   that -- that is unlawful.  But, Your Honor, more to the point,

22   Ms. Cooper spoke with Rhonda Encinas-Castro about the charge of

23   this -- of discrimination.  Ms. Cooper reported that

24   conversation to Ginger Call and Ms. Call was at

25   Ms. Encinas-Castro's termination hearing.  It's a key witness

1  to knowledge.

2          Similarly, Ms. Butler, prior to that May termination

3  meeting in 2003, Mr. Cornelison spoke to Ms. Butler, who was

4  one of charging parties' supervisors about whether Ms. Encinas-

5  Castro filed her charge.  These witnesses clearly go to

6  knowledge.  Ms. Phillippi, Your Honor, was not deposed.  So

7  they do not know the full extent of what she may testify to.

8  So at this time it would be --

9          THE COURT:  Well, how do you know it, did you

10  interview her?

11          MR. HOUK:  We have spoken with her --

12          THE COURT:  Okay.

13          MR. HOUK:  -- Your Honor.  And so these three

14  witnesses are very important to the EEOC's case.  And the Court

15  can, at the time of the testimony, entertain an objection and

16  weigh what evidence is presented at that time.  Thank you.

17          THE COURT:  Thank you.

18          MS. SHOUPE-GORGA:  Just briefly, Your Honor.  Again,

19  with regard to Cooper and Butler, to the extent that they have

20  personal information regarding either Ms. Allen or

21  Ms. Encinas-Castro, we're not objecting to that.  We're

22  objecting to ancillary and extended collateral issues that,

23  again, is not germane to the issue.

24          THE COURT:  Well, what about something that may go to

25  Mr. Cornelison's knowledge, such as -- I'm going to say,

1  witness X tells Mr. Cornelison, by the way, she said that she

2  filed a discrimination complaint and he says, what are you

3  talking about?  And then he gains some knowledge.  It doesn't

4  prove the truth to the world there was -- words that it was

5  discrimination, but it goes to his knowledge that somebody was

6  complaining about discrimination and what he does as a result

7  of that activity, whether he then accommodates that complaint

8  or whether he retaliates against it.

9          MS. SHOUPE-GORGA:  Well, I think to that extent Your

10  Honor is correct.  That if they're part of the rumor mill,

11  these witnesses, then they can testify to what they were told

12  or they may be able to testify, depending on how it's --

13          THE COURT:  Correct, yes.

14          MS. SHOUPE-GORGA:  -- get presented, but what the

15  problem is in these issues are with Cooper and Butler at least,

16  is that Cooper doesn't know anything about Encinas-Castro and

17  said that specifically in her deposition.  And Butler said she

18  was never close to Rhonda, doesn't really know anything.  The

19  majority of Ms. Butler's deposition was just her own personal

20  issues and not even that much information with regard to, you

21  know, why we're here.

22          But it appears that what the EEOC is trying to do

23  again is to manipulate things into a disparate treatment case,

24  as opposed to a retaliation case.  And as Your Honor has

25  mentioned before, I think there is a lot of potential injury or

1  prejudice to Creative Networks if that so happens.  Phillippi,

2  EEOC said that -- with her that they don't know what she's

3  going to say.  Well, they've produced a document that says what

4  she's going to say and it has nothing to do with either Ms.

5  Encinas-Castro or Ms. Allen.

6           THE COURT:  Okay.  Thank you.

7           MS. SHOUPE-GORGA:  Thank you.

8           THE COURT:  I do believe in this case it's -- the

9  motion is premature because there's a lot of back and forth on

10 what their testimony could be, might be possibly, but it has to

11 have some grounding in personal knowledge or some basis by

12 which it conveys knowledge to someone else.  This will not be

13 just a wide-ranging discussion of their own personal disputes

14 with Creative Networks or Mr. Cornelison.  It has to be

15 grounded in the facts of this case really to Ms. Encinas and

16 Ms. Allen.  So it is premature, but we're laying the foundation

17 with these witnesses, let's make sure that we all do it

18 thoroughly so it makes it easier to rule on any objections that

19 might be out there.

20           Next thing is, there's a motion in limine on

21 preclusion of punitive damages for Ms. Allen.  One problem I

22 have with this, and you can argue this, is that it's more --

23 this is more in the nature of a motion for summary judgment

24 that could have been brought as opposed to a motion for -- in

25 limine.  And my concern is, I don't think I can make that until

1    we listen to the evidence, particularly punitive damages

2    claims, don't follow state law at all.  I mean, you don't need

3    the wicked mind and evil heart.  There's a different statement

4    under Title 7 and it's by a preponderance of the evidence

5    versus clear and convincing evidence.  And based on what I see

6    now, I'd be happy to listen to you, I'm not sure I can rule on

7    that because I haven't heard the evidence yet.  So you can go

8    ahead and argue, if you wish.

9           MS. SHOUPE-GORGA:  I understand what Your Honor is

10   saying, and I think that to a lot of respect what you're saying

11   about summary judgment is true. What we raised this issue on --

12          THE COURT:  Is this a new subversion of Rule 56 or

13   what?

14          MS. SHOUPE-GORGA:  I'll give you a statement of facts

15   too.

16          THE COURT:  Okay.

17          MS. SHOUPE-GORGA:  What we brought this motion in

18   limine with regard to Allen only was on the issue of novelty.

19   And --

20          THE COURT:  Right.

21          MS. SHOUPE-GORGA:  -- and that was the only issue.

22   And that was based on one of the preemptions in Passantino that

23   if a situation is so novel that maybe the company or the

24   individual wouldn't have known.  And basically, when this was

25   raised was in Your Honor's order on the motions for summary

1   judgment and you yourself recognized that the protected

2   activity of being named as a witness in a charge was novel and

3   first impression --

4           THE COURT:  In the Ninth Circuit.

5           MS. SHOUPE-GORGA:  -- questioning that in the Ninth

6   Circuit.

7           THE COURT:  And I still believe that.  I mean, if it

8   is a -- but I go back to the heart of the issue, and that is

9   you want people to testify and convey information with honesty

10  and integrity.  And if you allow someone to be named as a

11  witness just -- and they have no idea because they may have

12  something that they're retaliated against, it stops the flow of

13  truthfulness of the information.  She might have testified -- I

14  thought Ms. Encinas-Castro was a terrible employee and she

15  deserved what she got.  I'm not saying she's going to say that,

16  but she could have.  And so therefore, if you look at it that

17  way, it would have stopped the flow of that information also.

18          And so that's what my concern is.  I don't know that

19  it's that novel.  It hasn't been ruled on by the Ninth Circuit,

20  but certainly other circuits have for the institutional reason,

21  I think under the cases, that is you want people who are named

22  to be able to testify truthfully and honestly without fear of

23  retaliation.  And that -- I'm not sure that's as novel as one

24  would think, but I'll be happy -- I'm not going to rule on it

25  now, but I'm going to keep it in mind as I listen to the

1    testimony as it goes through.

2            MS. SHOUPE-GORGA:  Okay.  Thank you, Your Honor.

3            THE COURT:  Thank you.  So that is deferred also

4    until Rule 50.

5            MS. SHANLEY:  May I speak to that as well, Your

6    Honor?

7            THE COURT:  Sure.

8            MS. SHANLEY:  Thank you.

9            THE COURT:  I just ruled in your favor.  Do you want

10    me to go back and look at it again?

11            MS. SHANLEY:  No, I just want to -- I actually just

12    want to agree with what you said and point out one thing.  And

13    although Passantino and Kolstad both talk about a possibility

14    of a novel theory of discrimination, we're not talking here

15    about the theory of discrimination, which is retaliation.

16    We're talking about one element and whether a protected

17    activity is or is not something new.  And as you've already

18    pointed out, it's really not a -- although the Ninth Circuit

19    hasn't ruled on it, you know, there's a lot of things I would

20    maintain that haven't been ruled on because they're fairly

21    obvious and this could be very well one of them.

22            THE COURT:  Now you've moved into a patent type test

23    on obviousness.  So I appreciate that.

24            MS. SHANLEY:  Okay.

25            THE COURT:  Thank you, Ms. Shanley, I appreciate your

1    comments.

2         MS. SHANLEY:  Thank you, Your Honor.

3         THE COURT:  Thank you.  Let me ask, because that is a

4    subpart of that and I think that's important to note.  The

5    other thing is, on the Plaintiff's side, exactly how much money

6    are we talking?  I know you have your other issues with regard

7    to the non-damage type relief you're seeking, but how much

8    money are we actually talking about in this case?

9         MS. SHANLEY:  Well, Your Honor, I hesitate to get

10   into actual dollars, but I will tell you that Mr. Blair and I

11   have been working diligently to try to reach a resolution of

12   the case and we're hopeful that we're going to do that in the

13   next week or so.

14        THE COURT:  Okay.  Okay.  Well --

15        MS. SHANLEY:  Is that fair, Jim?

16        THE COURT:  -- if that works out fine, if it doesn't

17   that's fine too.  I was just kind of curious and I don't want

18   to upset the apple cart if you think by that disclosing that

19   number to me, because I am looking forward to hearing some

20   testimony on this.  Mr. Blair, you want to jump in the middle

21   of this?

22        MR. BLAIR:  Well, I don't want to offend other

23   Counsel, but I got to -- the direct answer to your question is

24   almost no damages at all on this case is going to be put on the

25   blackboard.  It's all going to be numbers based on the women

1   waving their arms and saying they have consequential damages

2   from being -- losing their jobs.

3            THE COURT:  Okay.  Well, that -- I mean, we see that

4   in every case, but I was wondering about, you know, other type

5   damages.  And, you know, as we move into the punitive or not.

6   Okay.

7            Let me see here.  And if you resolve the case,

8   that's fine, and if you don't, that's fine too.

9            MS. SHANLEY:  Thank you, Your Honor.

10           THE COURT:  I -- because this case has pending so

11  long, it's been up and down and sideways, I thought it's

12  important -- we have some openings in our trial schedule and it

13  was important since all the discovery has been completed to try

14  and get this case tried and move forward since the settlement

15  did not produce a settlement, but it -- I understand there's

16  been issues in that regard.

17           Now the issue about back pay claims.  These are

18  equitable issues and I can figure that out if we go to trial.

19  I mean, I've done this in all the other cases, so I don't think

20  I can do that one.  So that's not going to go to a jury on that

21  issue.

22           MS. SHANLEY:  And no evidence as well, Your Honor?

23           THE COURT:  No, you can give me the evidence.  I

24  mean, I found in most of these cases it's pretty obvious if

25  someone lost money, there's documents to show that.  And if

1  there's no documents and nobody's lost any money, parties have

2  been pretty candid about that sort of thing.  So -- and we can

3  take care of that also with discussion -- with an instruction

4  to the jury.

5         The other thing is, do we need to prescreen the jury

6  in this case?  Anything that goes into, you know, almost two

7  weeks, sometimes I don't prescreen them, but other times the

8  parties prefer that because it saves a little time.  And we

9  work with the jury administrator, but we need some time to

10  orchestrate that and we do it particularly in our -- a lot of

11  our longer civil cases and criminal cases to find jurors who

12  would not be precluded because of time.  You imagine what it's

13  like in your own schedule and somebody say oh by the way, we

14  need you for four weeks.  Two weeks is not too bad, but again

15  it would create some movement, especially when they get called

16  in the early part of the month right off the bat.  And we're

17  getting into vacation season and all those sort of things.  So

18  tell me what you think?

19         MS. SHANLEY:  I think that's probably a good idea,

20  Your Honor.

21         THE COURT:  Prescreen them?

22         MS. SHANLEY:  Prescreening.

23         MR. BLAIR:  Agree, Your Honor.

24         THE COURT:  Okay.  We can do that.  We'll work with

25  the jury administrator then.  And we'll settle the final jury

1    instructions as we get into the trial.  How long do you think

2    this will take in reality if it's not bifurcated?  If it's

3    bifurcated I'm just going to double it, so if it's not

4    bifurcated?

5            MS. SHANLEY:  Your Honor, we've looked at the

6    witnesses and the testimony that we think will be offered and I

7    think realistically, depending on how the days go, four to five

8    days it should be finished.

9            MR. BLAIR:  I was going to say five days, Your Honor.

10           THE COURT:  Okay.  Well, that puts us into the second

11   week then.

12           MS. SHANLEY:  Right.

13           THE COURT:  So we'll allow the -- I'm just going to

14   keep the entire probably two weeks open, not because I think

15   you'll need it, but just to be sure in case there's a glitch

16   somewhere; we get somebody who doesn't feel well or this or

17   that or the other thing.  So we'll try and do that.

18           Okay.  We've taken care of basically the motions in

19   limine, the motion to sever or bifurcate as the case may be is

20   under advisement.  The preliminary jury instructions, you can

21   take a look at those and let me know what you think depending

22   on the motion to bifurcate.  And I notice that in the final

23   jury instructions there's a lot of editorial adding to the

24   Ninth Circuit instructions and I will tell you I'm a big fan of

25   the Ninth Circuit jury instructions, so please keep that in

1    mind as you approach the final jury instructions.

2         Now with regard to other matters.  I -- oh, just so

3    your witnesses know, we go from 9:00 in the morning until about

4    4:00 to 4:30 in the afternoon.  Take a lunch break, morning

5    recess, afternoon recess briefly and move right on through the

6    day, so you know how to schedule your witnesses.  If we get

7    done at 12:30 and somebody says oh, our next witnesses can't be

8    there I'm not happy about that and you may lose your witnesses

9    on either side, because I've given you dedicated time.  We're

10   not riding the calendar and they can arrange their schedule.

11   This is what they're here for and if you think you're going to

12   have a problem and they're an in-state resident, put a subpoena

13   on them.  That way there's no question about it.

14         Now with that -- yes, go ahead.

15         MR. BLAIR:  Your Honor, could we get a commitment

16   from the EEOC as to so many days ahead of trial as to who the

17   witnesses are going to be and in what order?

18         THE COURT:  That would be helpful for both sides to

19   get an idea, so that you can prepare for your

20   cross-examinations and scheduling of witnesses and things like

21   that, especially if there may be one witness that you're both

22   going to call, then I allow you to just call them once and we

23   explain that to the jury.  We're not going to bring them back

24   twice, unless you tell me that we're going to use it -- that

25   for strategic reasons because you may get into the federal rule

1    of testimony outside and cross outside direct testimony, that

2    sort of thing, which can be very limiting.  So if someone says,

3    what's your name and address and somebody says, well isn't it

4    true you went to high school at such-and-such?  That's outside

5    the scope of direct examination and then you'd have to call

6    them back to find out where they went to high school on the

7    other side.  Not that you would necessarily do that, but it

8    always comes as a surprise to people who practice law in State

9    Court where you have the open cross-examination.  It just

10   doesn't work that way.

11         But the last couple cases I've tried both parties

12   have said, we're both going to call these witnesses, can we

13   just do our direct and cross and we have no objection to either

14   side doing that?  And I said that's fine with me.  And then I

15   explained that to the jury, that normally they might be called

16   in one case or another, but the parties have agreed because

17   they would call these witnesses, that we're just going to

18   listen to their testimony once and it's up to you to decide how

19   much weight to give to that testimony, no matter who called the

20   witness.  It's the facts that they're testifying about that are

21   important.

22         MR. BLAIR:  Okay.

23         THE COURT:  So can we help us, about how long do you

24   think you might need in advance?

25         MR. BLAIR:  Well, I would think that ten days before

1   trial we ought to be able to not only exchange whose going to

2   be called, some will be under subpoena, but also commit to the

3   order that they're intending to be called.

4           THE COURT:  I think at least seven days in trial --

5   in front of trial --

6           MR. BLAIR:  Okay.

7           THE COURT:  -- that they can give you a list of their

8   witnesses and their schedule of their witnesses.

9           MS. SHANLEY:  And you would do the same.

10          THE COURT:  And the same goes for the other side.

11          MR. BLAIR:  Sure.

12          MS. SHANLEY:  Okay.  We'll certainly do our best.  I

13  -- you know, sometimes the order might change because of a

14  witnesses, you know, prior -- schedule or something, but we'll

15  certainly do our best to keep Defendant apprised of the order.

16          THE COURT:  And I appreciate that about their

17  schedules, but this case has been pending for a long time and

18  it's my schedule that counts.

19          MS. SHANLEY:  That's true, Your Honor.

20          THE COURT:  And we've done everything to accommodate

21  the parties and the witnesses and I really -- and I find this

22  more problematic with experts who still want to -- even though

23  they know the trial date, they want to schedule their time as

24  though they're checking into a hotel somewhere and I don't

25  think that's fair to the jury at all.

37

```
 1              MS. SHANLEY:  I agree, Your Honor.

 2              THE COURT:  So let's -- we'll work on that and I

 3   think we can accommodate each other.

 4              MS. SHANLEY:  I think we can.

 5              THE COURT:  Okay.  Now what else do we need to take

 6   up today?

 7              MR. BLAIR:  I'd like to be heard, Your Honor, on this

 8   -- what's being labeled a discovery dispute.  We consider it an

 9   ex-parte communications problem.  And --

10              THE COURT:  That's right.  We have that one.  That's

11   Ms. Faulkner.

12              MR. BLAIR:  Yes.

13              THE COURT:  Please, go ahead and then you can respond

14   on that issue.

15              MR. BLAIR:  Your Honor, this goes back a little ways,

16   but it still has some bearing on the trial and that's why we

17   brought it to the Court's attention.

18              THE COURT:  Okay.

19              MR. BLAIR:  The background for this is that the EEOC

20   investigators and attorneys interview former employees.  They

21   go out and contact them at various stages during the

22   investigation stage or maybe during -- after the litigation has

23   been brought.  They take notes and then they use those notes as

24   sort of a help the witnesses when they're deposed and maybe at

25   trial.  I haven't seen it in action at trial, but maybe at
```

1    trial.  They remind them of comments they made sometime two,

2    three, four years ago, in this case particularly.  They don't

3    appear that when they do this, it does not appear that they

4    make a determination as to whether that former employee -- and

5    Edna Faulkner is going to be the example in this case -- that

6    former employee can in fact impute liability to the employer.

7    It doesn't look like they do that.  It looks like instead what

8    they do is just call people, contact them, take notes, use

9    those notes in some form later against them.

10           Our -- and Edna Faulkner, as I pointed out, is the

11   one we made -- used as the example in this case.  I think

12   there's at least Linda Leary, another example of a manager,

13   someone in the chain, who were in these key counseling sessions

14   who were, in our minds, able to impute liability to the

15   employer that were contacted, we believe inappropriately.  We

16   believe when you look at the <u>Lange</u> decision, which is been

17   among State Court and Federal Court for many years, that

18   decision, as well as Ethical Rule 4.2, we believe that it's

19   very clear now that a manager's testimony that if you have a

20   former employee who was a manager who can impute liability to

21   the employer, you can't contact them ex-parte; you have to call

22   the counsel.  We believe that's what the law says.  We believe

23   they resolve --

24           THE COURT:  What happens if the former employee kind

25   of drifts off the radar chart and they find them first and they

1   called them and said now, you know, are represented by an

2   attorney in this lawsuit with regard to this case?  And if the

3   party says no, I'm not represented and they sort of make a

4   determination that they don't believe they're that high up in

5   the food chain of directors and managers, <u>Lange</u> seems to say

6   that maybe they're entitled to them.

7           MR. BLAIR:  I believe they can talk long enough to

8   find out -- make that determination --

9           THE COURT:  Okay.

10          MR. BLAIR:  -- but I think before they make those

11  ultimate -- ask those ultimate questions that could impute

12  liability to the employer that they're precluded by <u>Lange</u> and

13  4.2 from going that far.  At that stage, I believe the case law

14  interpreting 4.2 and that <u>Lange</u> relied on, says they have to

15  stop if they're in that food chain somewhere, such that the

16  impact of their testimony could impute liability.  That's what

17  our argument is.

18          We believe that in this case Edna Faulkner was an

19  example of that because she was the direct supervisor.  She was

20  in that counseling session that we claim was a counseling

21  session and they claim was a bullying session.  If she was a

22  bully at -- during that session then she could -- who knows

23  what she could do.  We know now from deposing her that she's a

24  good witness -- she's a good witness for us, but we didn't know

25  at the time and we believe the EEOC violated this ethical rule

1    and this case law when they went forward to determine what she

2    would have to say.

3            THE COURT:  Okay.  Now, so what are you saying though

4    with regard to -- if she's a good witness for you and she's

5    going to be here and assuming for the moment that they maybe

6    shouldn't have spoken to her -- assuming, I'm not saying that

7    they didn't, but assuming that they did, she didn't say

8    anything that bad and is it no harm, no foul in this case?

9            MR. BLAIR:  It sort of is, except we don't know what

10   statement they got from her.  We don't know -- we didn't get

11   it, so we think she ought to have to turn the -- they ought to

12   turn the statement over and not use it at trial, because we

13   believe it was gathered in an improper fashion.

14           THE COURT:  Well, it may be, but on the other hand if

15   she says I don't know what I told you three years ago and they

16   show her the statement then you've got it, right?

17           Mr. Blair:  Yep, that's also what has happened in

18   some of these instances, is that I sat in a deposition where

19   the person I was sitting beside couldn't recall the discussion,

20   all they recall -- excuse me, although this person recalled

21   having a discussion.  So you're right, that can also happen,

22   but it's a -- it's not proper and therefore it becomes -- it

23   sort of like refreshing recollection of someone in an improper

24   way.

25           THE COURT:  Right.

1              Mr. Blair:  That's why I'm saying --

2              THE COURT:  Well --

3              Mr. Blair:  I don't believe it's instrumental in this

4    case.  I don't know yet, because I don't know what other

5    statements they're going to shove in front of people, or show

6    them or read from at the trial, but I'd like to stop that --

7    prevent that from happening by bringing this motion to the

8    Court's attention.

9              THE COURT:  Okay.  Thank you.

10             MR. BLAIR:  I will say briefly that the EEOC's

11   positions are -- to the Court's comment earlier, they say well,

12   she wasn't high enough in the food chain.  Well, high enough in

13   the food chain, according to my read of the law, is anyone in

14   there that can impute liability, whether they be direct

15   supervisor or the president of the company, and that's what I

16   think the case law says as well.

17             They also point out that critical witnesses that are

18   former employees can be ex-parte contacted and I'm not

19   challenging that either.  They could call up someone who wasn't

20   in the food chain who could be very incriminating of my client

21   and they can make that comment.  So the law is kind of narrow.

22   It's -- Lange talks about former employees who were managers in

23   the food chain.

24             And the last comment, they say they don't -- they say

25   well there's only Ms. Faulkner and we don't know of any others

1    and that's frustrating to me, Your Honor, because I sat next to

2    Linda Leary and I know they got a statement from her from an

3    investigator at some point way back in this case, well before

4    there was even a lawsuit filed.  So I don't know to what extent

5    they have statements from individuals.  I heard earlier today

6    counsel say something about Ann Phillippi.  That probably is an

7    appropriate one because she wasn't in the food chain, but I

8    don't know who else they've contacted.

9              THE COURT:  Well, the only problem with statements --

10    and this is where we have some background that we get people

11    all the time who give statements to the FBI and they'll say,

12    that's not the statement I gave and I don't recall what I gave.

13    You can't -- they either have to refresh their recollection,

14    because generally the witness is -- and I don't know what the

15    EEOC policy is with their investigators, but unless the witness

16    adopts that statement, it's not going to come in.

17              MR. BLAIR:  Yeah, the reason this has become

18    troublesome in this case, Your Honor, is because during the

19    civil deposition of Linda Leary, for example, she's confronted

20    with well, do you remember somebody calling you a couple years

21    ago and talking to you on the phone.  And the honest, honorable

22    response to that would be gee, I do remember that call and

23    whatever I told them I'm sure was honest.

24              THE COURT:  Yeah.

25              MR. BLAIR:  And so then they're kind of committed to

1  something that they can't see, they didn't sign it, but they

2  may have said across a phone line.  At least that's someone at

3  this end has written down that they said across a phone line.

4          THE COURT:  That may be, but that's not the way it

5  should be used.  But anyway, but go ahead.  I want --

6          MR. BLAIR:  That's all I have, Your Honor.

7          THE COURT:  Thank you.  Ms. Shanley?

8      MS. SHANLEY:  Thank you, Your Honor.  First of all,

9  the discovery dispute only involved Edna Faulkner and it seems

10  to have expanded, so I want to just talk very briefly about

11  statements that are in our investigative file as opposed to

12  conversations that our lawyers have during litigation.

13          The lawyers do not participate in the investigations

14  and the investigators, you know, do go out and interview anyone

15  that they think has information, hopefully.  And --

16          THE COURT:  Wait.  But who makes that decision early

17  on whether they should -- whether Lange applies to them or not?

18  Because they're still an arm of yours and if they just go out

19  willy nilly and start interviewing people that could pose some

20  serious problems as it relates to attorneys in your office.

21      MS. SHANLEY:  Well, that's what I'm trying to make

22  the distinction, Your Honor.  We don't tell them who to go

23  interview.  That's done in the investigative side of the office

24  by this supervisors and the -- and, you know, the

25  investigators.  Generally if an -- a party is represented and

1  asked to be present at interviews that usually happens, but

2  it's not -- I don't believe that <u>Lange</u> or 4.2 applies.  Now I

3  can't address, you know, I don't know what statement he's

4  talking about of Megan Neal, but I know that all non-privileged

5  parts of the file were turned over.  So if there was interview

6  notes of her interview than Defendant had it as well.

7          But as to Ms. Faulkner, the dispute arose through Ms.

8  Rosas talking to her.  And as we analyze <u>Lange</u>, if a former

9  manager is not involved directly in the litigation, in other

10 words they're not advising in the litigation or helping in the

11 litigation, and nothing that they have done is going to impute

12 liability, that under <u>Lange</u> and 4.2 we do have the opportunity

13 to interview them.

14         THE COURT:  What happens though if she's in a meeting

15 and she listens to some critical statements that could, by her

16 observations, impute liability to the company?  Do you think

17 under those circumstances she's entitled to be interviewed?

18         MS. SHANLEY:  I believe so, Your Honor, because she's

19 just there -- then she's just as a witness.  If she's making

20 statements that could impute liability, I agree then.  I think

21 the conversation has to stop and the interview has to stop, and

22 that's always what we do when we, as lawyers in the litigation,

23 or our paralegals or someone who we're directing.  One of the

24 first questions they ask is, you know, are you represented,

25 have you been involved in the litigation?  In this case we

1   never identified Ms. Faulkner as anything but a witness to what

2   went on in that counseling session.  There was never any

3   allegation that she did any of the counseling or, you know, was

4   a bully or anything of that nature.  She was just a witness to

5   what went on and that's why -- she was contacted, you know, way

6   -- long before she was ever identified even as a witness by the

7   Defendant.  And as Defendant pointed -- I -- admitted at one

8   point that, you know, it was because Larry Fleishman said this

9   is somebody you probably should have add as a witness that they

10  added her to their list.  The conversation had taken place long

11  before that and we had no further contacts once they raised

12  this issue, you know, just out of an abundance of caution.

13          THE COURT:  Okay.

14          MS. SHANLEY:  So I don't believe that there was any

15  violation of Lange or 4.2.  That's something we take seriously.

16  Now I think that, you know, conflating it with interview notes

17  -- and, Your Honor, you're absolutely right.  I mean, those --

18  we may list them as exhibits, but you know, are we ever going

19  to get them in?  Probably not because they're not signed

20  statements and would only be used to refresh recollections.

21  I'm talking about interview notes from the investigation.

22          THE COURT:  Right.  But the issue is, the

23  investigator would have to prove whether it's a misstatement or

24  not, but if you hand it to the person and they say well, that

25  doesn't refresh my recollection at all.

```
 1          MS. SHANLEY:  Then --

 2          THE COURT:  Then --

 3          MS. SHANLEY:  -- doesn't help --

 4          THE COURT:  -- that's it.

 5          MS. SHANLEY:  Yeah, that is it.  I agree.

 6          THE COURT:  Now if you give them a copy of Orphan

 7  Annie and they say yes, that inter -- that refreshes my

 8  recollection, Orphan Annie doesn't come in, but the statement

 9  does.

10          MS. SHANLEY:  Right.  I agree, Your Honor.

11          THE COURT:  Okay.  Just so we understand all the --

12  we're in agreement here on the rules.  All right.

13          MS. SHANLEY:  All right.

14          THE COURT:  Go ahead.  Thank you.

15          MS. SHANLEY:  Really, that's it, unless you have

16  other questions, Your Honor.  I don't believe that there was

17  any violation.

18          THE COURT:  Okay.  Mr. Blair?  I mean, I guess what

19  I'm concerned is, did she have something to do at that meeting,

20  other than just observing what went on at the time?

21          MR. BLAIR:  Well, we didn't know at the time, she was

22  the supervisor that wrote up the notes summarizing the meeting.

23  And she was like -- I guess if there were three individuals at

24  that meeting besides Ms. Allen then she was the lowest on the

25  totem pole, but she's also the one that would evaluate
```

1  performance after that.  And so, I mean, she's key as to what
2  happened in that meeting.  And I'm not sure we know yet today
3  who all spoke and who said what at that meeting.
4         THE COURT:  Well, okay.  But I mean, you would agree
5  that if she -- if it's as I -- my hypothetical, she sat there
6  and listened to everybody and didn't say anything, but observed
7  the back and forth among the parties, then she would be subject
8  to being interviewed, right?
9         MR. BLAIR:  Would not?
10        THE COURT:  Would.
11        MR. BLAIR:  Would be -- well, I would say to that --
12        THE COURT:  As long as she's not a -- as long as
13  she's not a designated manager.  If she happened to be at the
14  meeting, watching this back and forth, and she's been gone for
15  two or three years and your company didn't contact her until
16  Mr. Fleischman said it'd be a good idea, but she's -- no one
17  has contacted her and all of a sudden the Plaintiffs stumble on
18  her and say gee, you know, she's not a manager or whatever.
19        MR. BLAIR:  I believe, if at that meeting -- if when
20  called she said oh, yeah, I remember that was the meeting where
21  Cornelison heard about this rumor mill and really laid into
22  Allen.  She could make that kind of a statement -- could have
23  made that kind of a statement across a phone line that would be
24  very incriminating and impute liability to the company just by
25  the very testimony.  And EEOC can't possibly know before they

48

1    call her whether that's what she's going to say or not.

2          When we learned they had spoken with her, obviously

3    we wanted to talk to her.  She lives in Virginia now.  We

4    wanted to talk to her to find out, you know, what did she say

5    happened at the meeting, because she's the one that had

6    sponsored the notes.  I believe --

7          THE COURT:  But you had the notes?

8          MR. BLAIR:  Well, I don't know whether she had them

9    anymore; we had copies of them.

10          THE COURT:  No, no, you had the notes.

11          MR. BLAIR:  We had the notes.

12          THE COURT:  So you would have known what her

13    observations and things were by reviewing the notes.

14          MR. BLAIR:  What we knew from the notes were what her

15    summary of what transpired were.  It certainly wasn't -- you

16    know, it wasn't the kind -- it was one-page, for example, for

17    whatever it was, a 20 or a 30-page -- 30 second -- 30 minute

18    discussion.  So we can't know until we talk to her what it is

19    -- whether she has anything incriminating to say about the

20    company or about what took place in that meeting.  That's why

21    we think it was an inappropriate communication.

22          THE COURT:  Okay.  Thank you.

23          MR. BLAIR:  As to the investigator notes, Ms. Shanley

24    was pointing out that while gee, you know, we can't be

25    responsible for what the investigators did, I think they are

1    responsible for what the investigators do.

2              THE COURT:  I'm not sure --

3              MR. BLAIR:  I think the investigators are probably

4    trained by the EEOC.

5              THE COURT:  I'm not sure she said that.  I think she

6    said that they give them some sort of guidance, but they tend

7    to go out on their own.

8              MR. BLAIR:  Okay.

9              THE COURT:  But I agree with you.  I think you cannot

10   just turn people loose because they are bound by court rule and

11   evidentiary rules and all the other ethical rules, because it

12   comes back to you as the attorney.  If you're just sort of the

13   blind eye saying go out and violate these rules of evidence, I

14   don't think that you can get away with that, and I don't think

15   that the EEOC did -- their lawyers did something wrong here,

16   but I just don't -- I don't think you can get away.

17             That's like telling a policeman well, go out and

18   seize the evidence and break down the front door, in violation

19   of someone's Fourth Amendment rights, but I'm not going to tell

20   you how to do it, but if you do that and you do it, well so

21   what.  That's not right.

22             MR. BLAIR:  Yeah.  The analogy that I was going to

23   use is, I could instruct someone to go violate Lange willy

24   nilly and just let me know what you learn, but it's not on my

25   nickel.

1          THE COURT:  That's right.

2          MR. BLAIR:  It can't be the law.

3          THE COURT:  I don't think you can escape that.  I

4    think there's --

5          MR. BLAIR:  The last point, Ms. Shanley mentioned --

6    you know, I don't know what's become of these notes, but I

7    don't believe -- they're certainly not listed as exhibits in

8    the pretrial order, so I have a feeling they're in their cross-

9    examination folder.  And my only -- I don't believe those

10   should be something that can be used at this trial.  That's all

11   I'm saying.

12         THE COURT:  Well, you know, I mean, part of it is --

13   I'm sure you would object, but the first time someone says to a

14   witness where I've had an issue like this and somebody says, do

15   you recall being interviewed by such-and-such on such-and-such

16   a date?  You know, right then I -- my antenna goes up because

17   I'm noting we may get into some issues that may or may not be

18   proper cross-examination.

19         MR. BLAIR:  Well, and our --

20         THE COURT:  But it depends a little bit on the

21   objective --

22         MR. BLAIR:  Right.

23         THE COURT:  -- objections being made also.

24         MR. BLAIR:  And we're going to be doing our best as

25   well, Your Honor.  Thank you.

1           THE COURT:  Oh, I'm sure.  Thank you.  Anything else?

2           MS. SHANLEY:  No, Your Honor.

3           THE COURT:  Okay.  Well, with regard to Ms. Rosas'

4    interview, <u>Lange</u> and the cases interpreting <u>Lange</u> and Ethics

5    Rule 4.2 are very exacting in some regards and the exceptions

6    are a little vaguer than that.  And I -- on balance, I've

7    looked at what's been happening and I've listened to your

8    arguments, and I find that Ms. Rosas did not violate <u>Lange</u> or

9    Rule 4.2.

10          Now whether any evidence that was gleaned by that is

11   available or not, is a horse of a different nature, because it

12   may not be available.  Ms. Rosas is a problem because she was

13   the attorney of record and attorneys of record generally can't

14   be used as witnesses in a case.  So if she got out of this case

15   on the eve of, I'm not going to let her come back and say well,

16   when I talked to Ms. Faulkner this is what she told me on this

17   issue.  I don't think that's going to fly.

18          MS. SHANLEY:  We have no intention of doing that,

19   Your Honor.

20          THE COURT:  I didn't think so.  So there we go.  And

21   the other thing is, I don't -- I -- this is a little closer

22   question, but I mean, having observed counsel who has been here

23   before, in the context of this because the Defendants did have

24   the notes of the meeting, they knew that Ms. Faulkner might be

25   a witness in the case, and they could have reached out to her

1    and said, you're a witness and we're going to represent you in

2    this matter or you're -- you know, if you get contacted, have

3    someone call us first.  That could have happened.

4         I know these things move quickly, but I just don't

5    think that Ms. Rosas is of the ilk to flagrantly violate the

6    rules.  And the reason I say that is because Lange is really

7    grounded in Rule 4.2, and this is something you get your ticket

8    punched over, and I've had some cases where some people have

9    gotten in some serious hot water with the Bar Association over

10   this issue.  And this is one of the few that is grounded in

11   ethical considerations.  And so I -- I don't find that what she

12   did was a willful intent to violate Lange.

13        The protections are already in place now to protect

14   the Defendant, corporation and their witnesses with regard to

15   Ms. Faulkner's testimony.  I would however, because I do think

16   there's some respondeat superior issues, that Ms. Shanley, I

17   know you're a supervisor, that at least at some point down the

18   road, just to be sure, because you said you take Lange

19   seriously, that there be some additional training because

20   people turn over -- investigators turn over things like that,

21   that a continuing effort to be made in compliance with Lange so

22   we don't hit these bumps in the road down the road.  I think

23   that would be helpful.

24        MS. SHANLEY:  Yeah, I would point out, Your Honor,

25   that, you know, our investigators have very large caseloads.

1    We don't always know what they're investigating, but we

2    certainly would never advise them to go do something we can't

3    do.

4            THE COURT:  And I know that, but I mean, I'm just

5    saying that sometimes they take it upon their own and they --

6    and you would be surprised sometimes at what they say about who

7    told what to whom, so therefore -- I just throw that out as a

8    note of caution to help everybody out.

9            Now, with that in mind, what else do we need to take

10   care of today?

11           MR. BLAIR:  Your Honor, could I be heard one more

12   time -- I apologize for this, for not saying it while I was up

13   there.  Could we either have a commitment from the EEOC that

14   they're not going to use the investigator notes that they've

15   gathered relating to this case or turn a copy over to counsel

16   for the Defendant?

17           THE COURT:  Well, the trouble is in this case, it's

18   the attorney's notes that are in question, it's not the

19   investigator; isn't that correct?

20           MR. BLAIR:  Well, no, no, both.  Both.  We're not

21   only upset with the contacts with respect to Edna Faulkner,

22   which I think the Court has resolved appropriately today, or at

23   least fairly, what I'm also bothered by is investigator notes

24   that could be used at trial.  And if she's not going to use

25   them, great, but I know they have them.

1      MS. SHANLEY:  Your Honor, we've turned over every

2  non-privileged part of the file.  So if there were interviews

3  taken by the investigator, they have them.

4      THE COURT:  If they were done through the

5  investigative process, you have to turn those over to them --

6      MS. SHANLEY:  We did.

7      THE COURT:  -- as part of the EEOC.  So check and see

8  if there's something in there.

9      MR. BLAIR:  Okay.

10      THE COURT:  If we hit something in the road, because

11  I don't want to spoil your goodwill of trying to find a

12  resolution to this case over something that may be in the heat

13  of the battle getting ready for the battle that we create a

14  problem with, that's all.

15      MS. SHANLEY:  Okay.

16      MR. BLAIR:  Thank you, Your Honor.  I didn't know

17  there were statements; I'll be looking for them.

18      THE COURT:  Okay.

19      MS. SHANLEY:  I don't know what there are, but I'm

20  saying if there were any, they were turned over.

21      THE COURT:  All right.  Now, is there -- because you

22  submitted the pretrial order, there aren't any real issues in

23  dispute, I don't think, with regard to your exhibits.  There

24  are very few exhibits.  Your witnesses have been identified and

25  I think that's pretty much it, because the punitive damages, we

1    have to defer that to listen to the evidence and some of the

2    other things that go along with it.  But again, the -- it's

3    been my experience with trying these cases that that issue is a

4    lot more -- Plaintiffs in a civil right suit have a little

5    wider latitude than they certainly do under State Court law.

6    In State Court law cases it's not uncommon to have a motion for

7    summary judgment or a Rule 50 motion made after the -- you

8    know, during the course of the case that you just -- you can't

9    get there, but it's a little bit wider, I think, in -- by

10   preponderance of the evidence in the standards set forth by

11   Congress in determining what punitive damage standard is.  So -

12   - but again, I would hope they wouldn't just hang their hat on

13   those -- that part of the case, because that's a little

14   narrower issue.

15           Okay.  Now -- and the instructions are different.

16   That's another thing, the instructions are different.  So --

17   anything else we ought to take up that you're aware of that

18   I've missed along the way?

19           MS. SHANLEY:  No, Your Honor, I can't think of

20   anything.

21           MR. BLAIR:  There are a number of objections to

22   exhibits, Your Honor, but there are so many of them we'd go

23   into the night talking about those, so.

24           THE COURT:  Well, that's what I was saying.  I -- and

25   some of those are contextual, because if you move an exhibit,

1    it could be -- and that's why, if they've been objected to,

2    everybody is sort of on notice that the -- there's going to be

3    an objection made, and if it doesn't come in, what's your

4    backup plan or what's your evidence?  So you need to be able to

5    lay the evidence to get them into trial.  I'm not sure -- I

6    mean, I see there's some relevance objections and things like

7    that, and I assume that you're going to make those at the time

8    of trial.

9            MR. BLAIR:  Yeah, there's a document here -- a

10   financial document that has to do with the parent company and I

11   talk to Ms. Shanley about it rather than argue it here today,

12   but we've noted our objection.

13           THE COURT:  Well, usually what I do with those,

14   before -- if you're going to be entitled to it, I usually make

15   that as a separate form of proof, not in the early part of the

16   case, because then we don't know if it's going to come in or if

17   it's -- if I make the determination that they're entitled to

18   prove punitive damages than I allow them to go forward with

19   some additional evidence and you can do cross-examination or

20   present whatever it is you want related to that.  And it also

21   helps the jury to understand that issue, because that way you

22   don't have something in front of them where they say oh well,

23   gee they've made millions and millions of dollars, let's just

24   use that as an excuse to give them something even though that's

25   out of the case.  I mean, the case is the case on retaliation.

57

1          MR. BLAIR:  That's all we have.  Thank you.

2          THE COURT:  Okay.  All right, then we'll stand in

3    recess.  We'll get an order out on the last part about the

4    severance.  I would ask you that if you do find a solution to

5    your case among yourselves that please let us know because it

6    takes a lot of work for the jury administrator to prescreen the

7    jury for those two weeks.  And it also -- it's valuable trial

8    time that someone else could probably use if necessary, but if

9    you don't the time is yours and we'll go forward with the case

10    during that timeframe, okay?  Thank you all very much.

11          MS. SHANLEY:  Thank you, Your Honor.

12          MR. BLAIR:  Thank you, Your Honor.

13          THE COURT:  We stand at recess.

14      (Proceedings Concluded)

15

16

17

18

19                              -oOo-

20

21

22

23

24

25

58

CERTIFICATE

I (we) certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


Dated: April 22, 2010

_Stephanie McNeel_

AVTranz
365 E. Coronado Road
Suite #100
Phoenix, AZ  85004-1525

**AVTranz**
E-Reporting and E-Transcription
Phoenix (602) 263-0885 • Tucson (520) 403-8024
Denver (303) 634-2295